UNITED STATES of America,
Plaintiff-Appellee,

v.

Fred W. SANS, Frank A. Weaner,
Raymond O. McDonald, Jr.,
Defendants-Appellants.

No. 82–3106.

United States Court of Appeals,
Eleventh Circuit.

May 11, 1984.

Rehearing and Rehearing En Banc
Denied June 27, 1984.

Michael C. Addison, Tampa, Fla., for Sans.

Anthony S. Battaglia, Stephen J. Wein, St. Petersburg, Fla., for Weaner & Mc-Donald.

Lynn Hamilton Cole, Asst. U.S. Atty., Tampa, Fla., Sidney M. Glazer, Atty., Appellate Sect., Criminal Div., Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before TJOFLAT and FAY, Circuit Judges, and WISDOM *, Senior Circuit Judge.

TJOFLAT, Circuit Judge:

This case involves the attempts of Leon Cohen and his associates to "launder" illegally obtained money through the Palm State Bank, Palm Harbor, Florida, and to avoid federal income tax liability. Leon Cohen, his bookkeeper Fred Sans, the Palm State Bank, and two of the bank's officers, Frank Weaner and Ray McDonald, were charged in four counts with conspiracy to defraud the government, failure to file currency transaction reports (CTR's) (two counts), and falsifying facts in a matter under the jurisdiction of the Internal Revenue Service (IRS).[1] Leon Cohen's case was severed because he was ill, and the remaining indictees went to trial before a jury. At the close of the government's case, the court acquitted all four defendants of the fourth count. The jury found Sans guilty of the conspiracy count only; it found Weaner, McDonald, and the Palm State Bank guilty only of the two counts of failure to file the CTR's. Sans, Weaner and McDonald appeal, presenting several claims of error. We affirm.

I.

The conduct for which appellants were indicted took place in 1976 and 1977. At that time, Leon Cohen, an Atlanta, Georgia, resident, owed the IRS over $600,000, and it had filed substantial tax liens against him. Appellant Sans was Cohen's bookkeeper and accountant. Between late 1976 and mid-1977, Cohen obtained over $900,000, much of it in small bills ($5's, $10's and $20's), through various schemes to defraud Leslie Atkinson, a convicted drug dealer then serving a federal sentence in the Atlanta penitentiary.[2]

In November 1976, Cohen, through his attorney Stanley Galkin and associate John Tipton, offered to sell Atkinson six kilograms of heroin for $300,000.[3] Atkinson's representatives and Cohen's representatives were to exchange the drugs and money; however, Cohen arranged a simulated arrest at the exchange point, inducing Atkinson's associates to flee without the drugs or the money. Tipton and Sans counted the money over a period of two days at Cohen's house. Tipton and Jerome Kaplan, a business associate of Cohen's, exchanged some of the money at Atlanta banks; Cohen had instructed them not to exchange more than $5,000 at any one bank, and not to attract attention.

In January 1977, Sans and Cohen showed Charles Michael, another of Cohen's associates, what Cohen boasted was "a million dollars" in low denomination bills, and Cohen gave him $25,000 of that money to exchange for $100 bills at several North Carolina banks. Sans and Tipton were present when Michael returned the clean money. Also in January, Cohen showed Milton Chalmers, a commercial loan officer in a St. Petersburg, Florida, bank, a briefcase full of money and sought to exchange it for one hundred dollar bills. Chalmers, declining to make the exchange, explained the federal reporting requirements;[4] Cohen commented that he could circumvent

---

* Honorable John Minor Wisdom, U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

1. See *infra* text at 3062 for the complete indictment.

2. Atkinson's conviction is reported in *United States v. Atkinson*, 565 F.2d 1283 (11th Cir. 1977), *cert. denied*, 436 U.S. 944, 98 S.Ct. 2845, 56 L.Ed.2d 785 (1978).

3. Atkinson apparently still managed a drug operation though he was incarcerated.

4. 31 U.S.C. § 1081 (1976) authorized the Secretary of the Treasury to require the reporting of domestic currency transactions. Pursuant to this authority, the Secretary promulgated 31 C.F.R. 103.22(a) (1983) providing that "[e]ach financial institution shall file a report of each deposit, withdrawal, exchange of currency or other payment or transfer, by, through, or to such financial institution, which involves a transaction in currency of more than $10,000."

the requirements by exchanging the money at the Palm State Bank because his associates controlled the bank.

On January 20, 1977, one day after the Palm State Bank received a large shipment of $100 and $50 bills from the Federal Reserve, Cohen came to the bank. Appellant McDonald, as the vice president with whom Cohen was dealing, brought Cohen to then head teller Rosemary Gardner and instructed her that Cohen had a large number of small bills that should be exchanged for large ones. $20,000 to $25,000 was exchanged on that occasion. McDonald told Gardner that no CTR was necessary, implying to her that such reports did not apply to exchanges of bills for other bills.

In early February 1977, appellant Weaner, in the presence of McDonald and Cohen, instructed his secretary Loraine Ingham to take a large stack of cash to Rosemary Gardner to be exchanged, and to open a safety deposit box for Cohen, but without his name appearing on the bank's records. They set up the account in Tipton's name.

On March 10, 1977, Galkin and Cohen, accompanied by Chalmers,[5] exchanged about $50,000 at the Palm State Bank. Teller Gary Watson, who exchanged the money, asked Rosemary Gardner if a CTR needed to be filed. Gardner took a CTR form to Weaner's office and returned with it five minutes later.[6] No form was filed.

In March and April 1977, Cohen weaseled more money out of Atkinson. Galkin, at Cohen's direction, convinced Atkinson that he had high official connections who, for a $1 million fee, could arrange Atkinson's release from prison. After receiving a $100,000 prepayment from one of Atkinson's associates, Cohen, impersonating then Associate Attorney General Michael Egan, visited Atkinson at the prison.

When Cohen returned, Sans and Tipton counted the $100,000. In April, Cohen forged a note to Atkinson's brother and used it to get $300,000 of Atkinson's money. Also in April, Cohen sent Sans to the Grand Cayman Islands where, by trick, Sans and Cohen arranged a wire transfer of $260,000 from an account Atkinson had there through a Canadian bank to a checking account in Sans' name at the Palm State Bank. Weaner's initials were on the card establishing the account.

On May 10, 1977, Palm State Bank received another Federal Reserve shipment of $50,000 in large bills. Cohen then exchanged about $40,000 in $5's, $10's and $20's for large bills. McDonald waited with Cohen at the teller window while then head teller Gary Watson made the exchange. Watson retained the small bills in his teller drawer. Watson again asked Rosemary Gardner about filing a CTR; no report was filed, however.

Cohen, Sans, Weaner, McDonald and Palm State Bank were indicted for: (count one) conspiracy to (a) defraud the United States by obstructing the IRS in its efforts to collect information and reports of currency transactions larger than $10,000, (b) falsify and conceal material facts within IRS jurisdiction in violation of 18 U.S.C. 1001, (c) willfully fail to file and cause the failure to file CTR's in connection with currency exchanges totaling in excess of $100,000 at Palm State Bank, and (d) defraud the United States by impeding collection of Cohen's income taxes; (count two) willful failure to file a CTR in connection with the March 10, 1977, money exchange; (count three) willful failure to file a CTR in connection with the May 10, 1977, money exchange; and (count four) concealing facts within IRS jurisdiction in violation of 18 U.S.C. 1001.

---

**5.** Cohen had asked Chalmers to accompany him on this trip, apparently to impress Chalmers with his authority at the Palm State Bank. Later that day, Cohen asked Chalmers if he could set up a similar exchange at the St. Petersburg bank. Chalmers, avoiding a direct refusal, told Cohen the risk involved would warrant a 10% charge on such an exchange.

**6.** The record does not reflect whether the form was filled out when Rosemary Gardner returned.

At trial, the government presented Galkin, Tipton, Chalmers, Watson, Rosemary Gardner and teller Shirley Scoggins, among others, as witnesses. They testified to the above transactions. The defendants denied any wrongdoing on their part. Sans' denial, presented through his attorney's argument to the jury, was that he did not know Cohen was violating the law and did not know about the money exchanges. Weaner testified that no exchange had taken place to his knowledge, and even if one had he would not have thought a CTR was required because he thought Cohen fell into a "known customer" exemption to the reporting requirements. The exemption, at 31 CFR § 103.22(b)(3) (1972), provided that a bank would not need to "report transactions with an established customer maintaining a deposit relationship with the bank, in amounts which the bank may reasonably conclude do not exceed amounts commensurate with the customary conduct of the business ... of the customer concerned." McDonald testified that he recalled one cash exchange; Cohen had told him a real estate seller he was dealing with needed cash in large bills for certain property Cohen was trying to purchase, and McDonald had allowed him to exchange some small bills for large bills. No other exchanges had taken place, and, for the purpose of that one exchange, he had considered Cohen a "known customer" and so had not filed the CTR.

The defendants sought to buttress their denials of wrong-doing with the testimony of the president of the Palm State Bank, Phyllis Jones, and a banking expert, Gerald Stogniew; their testimony raised an inference that the currency exchange of May 10, 1977, handled by Gary Watson, could not have taken place. Jones said the bank's guidelines on the amount of cash the head teller could have in his drawer at any one time was $25,000 to $30,000, substantially less than the amount Cohen gave Watson on May 10; under the guidelines, Watson would have been required to deposit the excess in the bank's vault. Stogniew opined that the records of the bank's vault showed no deposit on May 10 of the number of small denomination bills Watson said he received from Cohen on that date, the inference being, as the defendants argued to the jury, that Watson had not conducted the exchange. As we have indicated, the jury found the bank officers and the bank guilty of having willfully failed to file the CTR's; it found Sans guilty of conspiracy.

On appeal, Weaner, McDonald and Sans raise three kinds of error. The first would require us to enter one or more judgments of acquittal; the second would require us to grant one or more of the appellants a new trial, and the third would require us to grant a resentencing. In the first category are two claims by Weaner and McDonald: (1) that the rules requiring CTR's to be filed were unconstitutional as they resulted from an overbroad congressional delegation, and (2) that the evidence was insufficient to establish that the March 10 and May 10 transactions occurred and that any failure to file was willful.

Two claims by Weaner and McDonald would require a new trial: (1) that the trial court erred in refusing one of two jury instructions Weaner requested on willfulness, and (2) that the trial court erred in refusing expert testimony proffered by Weaner regarding the banking trade custom of ignoring currency regulations. Sans brings two claims requiring us to grant him a new trial. First, he claims that his conspiracy conviction is flawed because it may have been based on a conspiracy objective which, due to the acquittals of Weaner and McDonald on the conspiracy count, could not have been part of the conspiracy. Second, he claims that irrelevant and prejudicial evidence regarding Leon Cohen fatally flawed his conviction. He brings one claim of the third type, asking us to require that he be resentenced because the conspiracy charge contained both misdemeanor and felony objectives, such that Sans might be guilty of a misdemeanor conspiracy rather than a felony

conspiracy. If so, his sentence, as it stands, would be excessive. We first address Weaner's and McDonald's arguments.

## I.

### A. Constitutionality of the Regulations.

■ Weaner and McDonald were convicted of substantive violations of 31 U.S.C. §§ 1081 and 1058 (1976).[7] These statutory provisions were part of Chapter 21 of Title 31 of the United States Code, entitled Reports of Currency and Foreign Transactions. Section 1081 in its entirety provided that:

> Transactions involving any domestic financial institution shall be reported to the Secretary [of the Treasury] *at such time, in such manner,* and *in such detail,* as the Secretary may require if they involve the payment, receipt, or transfer of United States currency, or such other monetary instruments as the Secretary may specify, *in such amounts, denominations, or both,* or *under such circumstances, as the Secretary shall be regulation prescribe.* (emphasis supplied.)

Section 1058 in its entirety provided that:

> Whoever willfully violates any provision of this chapter or *any regulation under this chapter* shall be fined not more than $1,000 or imprisoned not more than one year, or both. (emphasis supplied.)

31 C.F.R. § 103.22 (1972), enacted by the Secretary of the Treasury pursuant to the aforementioned statutes, provided in pertinent part that:

> Each financial institution shall file a report of each deposit, withdrawal, exchange of currency or other payment or transfer, by, through, or to such financial institution, which involves a transaction of currency of more than $10,000.

Weaner and McDonald argue that the legislative delegation in section 1081 was too broad because Congress granted the Secretary the option to create criminal statutes in his sole discretion, unlimited by any guidelines.[8]

■ The U.S. Constitution, Art. 1, § 1, provides that "all legislative powers herein granted shall be vested in a Congress of the United States." Congress may not transfer to others the essential legislative functions with which it is vested. *Schechter Poultry Corp. v. United States,* 295 U.S. 495, 529, 55 S.Ct. 837, 843, 79 L.Ed. 1570 (1935). However, Congress may "authorize other bodies to determine specific facts and may also establish general standards and delegate to others the responsibility of effectuating the legislative policy." *United States v. Gordon,* 580 F.2d 827, 839 (5th Cir.) *cert. denied* 439 U.S. 1051, 99 S.Ct. 731, 58 L.Ed.2d 711 (1978), citing *Schechter.*

*United States v. Womack,* 654 F.2d 1034, 1037 (5th Cir. Unit B 1981) *cert. denied* 454 U.S. 1156, 102 S.Ct. 1029, 71 L.Ed.2d 314 (1982), describes the standard we apply in judging a delegation challenge:

> Congressional legislation which prescribes essential standards and basic legislative policy and delegates to an administrator authority for promulgation of rules and regulations is constitutionally

---

**7.** Since the indictment and trial, these sections have been revised and renumbered. Reports of Currency and Foreign Transactions now appear at 31 U.S.C.A. §§ 5311–5322 (1983) as Records and Reports on Monetary Instruments Transactions. Also, the regulations promulgated pursuant to the statutes have been amended since the dates of the alleged offense. Here, reference is made to the statutes and regulations as existing at the time of the alleged offenses.

**8.** They also argue that even if the statute is a constitutional delegation, the Secretary has ex-

ceeded the scope of that delegation in creating 31 C.F.R. § 103.22 (1983). They base this argument on section 1081's reference to reportable transactions as "payment, receipt, or transfer" of currency, and the regulation's coverage of "deposit, withdrawal, exchange of currency or other payment or transfer." An "exchange," they assert, was not contemplated by section 1081. This argument is not credible; an "exchange" is certainly nothing more than two "payments" and thus is covered by the language of section 1081.

permissible, provided the standards are "sufficiently definite and precise to enable Congress, the courts and the public to ascertain whether the Administrator ... has conformed to those standards." The standards of the statute are not to be tested in isolation but must derive meaningful content from the purpose of the statute and its factual background and the statutory context in which the standards appear. (citations omitted)

■ The statute in question here met these standards. The statute delegated a limited power to the Secretary: it enabled him to require only "reports" of transactions involving "monetary instruments" to which a "domestic financial institution" was a party. The statute defined both "monetary instruments" and "domestic financial institutions." While it is true that the Secretary might have chosen not to regulate at all under this section, if he chose to act he could require only that reports of transactions involving payment, receipt, or transfer of U.S. currency be made. Moreover, his choice whether to require the reports at all, or of what specific transactions, was limited by the purposes of the act, to require certain reports or records where such reports or records have *"a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings."* H.R. No. 975, 91st Cong., 2d Sess., *reprinted in* 1970 U.S.Code Cong. & Admin.News, 4394, 4395. The legislative history of the Act indicates that "the domestic reporting requirements were enacted because law enforcement agencies found that the growth of financial institutions had been paralleled by an increase in criminal activity associated with them." *Id.*

The limited nature of the delegation is even clearer when we consider, as we must, the factual background in which the statute appears. When the statute was enacted, the Secretary of the Treasury had been requiring reports of customers' large currency transactions for twenty-five years.

Reports had been required for "currency transactions that, in the judgment of the institution, exceeded those 'commensurate with the customary conduct of the business, industry or profession of the person or organization concerned.'" *California Bankers Association v. Shultz,* 416 U.S. 21, 37, 94 S.Ct. 1494, 1506, 39 L.Ed.2d 812 (1974). This pattern of regulation was merely continued by the reporting requirements in this case.

Given the single action the Secretary could undertake (requiring reports), the pattern of prior regulation, and the extent to which Congress defined in the statute and legislative history the targets of the reporting requirements, the transactions covered, and the purpose of the reporting legislation, we find no delegation problem here. That the Secretary under section 1081 could have imposed standards enforceable by criminal penalties did not make the delegation less valid, for "[i]t is well established that a delegatee may formulate rules for violation of which the statute itself provides penalties imposable by judicial process...." *Gordon,* 580 F.2d at 840 (citations omitted).

### B. Sufficiency of the Evidence

■ Weaner and McDonald argue that there was insufficient evidence to show that the counts two and three currency transactions occurred and that their failure to file CTR's was willful. We disagree. There was sufficient testimony from the teller Gary Watson and Weaner's secretary Loraine Ingham for the jury to find that the transactions took place. Watson's testimony was not, as appellants argue, rendered valueless by the testimony of the bank's president and the banking expert we have recited concerning the currency exchange of May 10, 1977. Watson flatly refuted the president's statement that the bank's guidelines limited the amount of cash he could have in his teller's drawer; he said the limit was $80,000. He also said that he kept the money he got from Cohen in the drawer overnight. Consequently, he

rendered meaningless the bank expert's testimony as to the state of the vault records on May 10.

The evidence was also sufficient for the jury to conclude that Cohen's actions did not reasonably fit within the known customer exemption. The evidence, albeit circumstantial, was also plainly adequate to support a conclusion that the bankers failed to file CTR's with specific intent to violate the reporting laws.

■ Weaner and McDonald next argue that their acquittal of the conspiracy count bars conviction of the substantive counts because the jury, in determining that they had not joined the Cohen-Sans conspiracy, implicitly determined that they had not failed to file CTR's following the March 10 and May 10 currency exchanges. This argument is clearly without merit. The jury could have found beyond a reasonable doubt that Sans and Cohen engaged in a conspiracy with each other to defraud the United States by obstructing the calculation and collection of Cohen's taxes, and also that the bankers had purposely violated currency laws by failing to file the CTR's. The jury could certainly have found the evidence sufficient to show that the bankers purposely violated the reporting laws, but perhaps did so just to boost their business, and not as coconspirators of Cohen or Sans. Contrary to Weaner's and McDonald's arguments, the jury's conclusion that the bankers should be acquitted of conspiracy is consistent with its determination that the currency exchanges took place. That conclusion could merely indicate that the jury did not find the bankers to have had the requisite state of mind to be conspirators when those exchanges occurred.

### C. The Willfulness Instruction

Weaner and McDonald asked the trial judge to instruct the jury on willfulness as follows:

The willfulness element under this law is of a special nature. The mere failure to comply with the terms of the law is not a violation, it must be shown beyond a reasonable doubt that the Defendant had specific knowledge of the reporting requirements alleged to have been violated. An acknowledgement by the Defendant of awareness of currency laws is not sufficient to prove willfulness under these statutes.

Declining to give this requested charge to the jury, the district court instructed the jury as follows:

Each of the following essential elements must be proved in order to establish the violation charged in Counts 2 and 3 of the indictment [the substantive counts charging failure to file the CTR's]:

\*    \*    \*    \*    \*    \*

[T]hird, that the defendant's act or acts, if any, in failing to file and causing the failure to file such a report were done willfully.

An act is willful if done *knowingly and with specific intent to act with a bad purpose,* either to disobey or to disregard the law. Specific intent, as the term implies, means more than the general intent to commit the act. To establish specific intent, *the Government must prove that a defendant knowingly did an act which the law forbids or knowingly failed to do an act which the law requires, purposely intending to violate the law.*

An act or a failure to act is knowingly done if done voluntarily and intentionally *and not because of mistake or accident or other innocent reasons.* (emphasis added.)

■ A trial court's refusal to deliver a requested instruction is reversible error only if the requested instruction (1) was correct, (2) was not substantially covered by others delivered, and (3) concerned a point in the trial so important that the failure to give the requested instruction seriously impaired the defendant's ability

to defend himself. *United States v. Stone,* 702 F.2d 1333, 1339 (11th Cir.1983); *Pine v. United States,* 135 F.2d 353, 355 (5th Cir.),[9] *cert. denied,* 320 U.S. 740, 64 S.Ct. 40, 88 L.Ed. 439 (1943); *see United States v. Hitsman,* 604 F.2d 443, 446 (5th Cir.1979). Here, to the extent the requested instruction was correct, it was substantially covered by the instruction the trial court gave.

██ The first sentence of the requested instruction was not a clear statement of the law. Any willfulness requirement may or may not be "special"; this elucidated nothing helpful for the jury. The second sentence was substantially covered by the willfulness instruction and the court's other instructions; those instructions placed the burden on the government to prove every element of the offense beyond a reasonable doubt, including that the defendants purposefully intended to violate the reporting law. The third sentence was also adequately covered; nothing in the judge's instructions would have led the jury to believe that knowing the law was enough in itself to show willfulness.[10] Accordingly we find no error in the trial judge's rejection of the requested instructions.

### D. The Expert Witness

Weaner and McDonald called a banking expert, Gerald Stogniew, to testify. Stogniew had been in banking for twenty-two years, had worked extensively as a bank auditor, and had conducted "director's audits."[11] Appellants asked the trial court to find Stogniew qualified as an expert on bank management for the purpose of testifying that banks universally ignored currency reporting requirements at the time of the Cohen transactions. They argued that this testimony, if received, would permit an inference that their failure to file the CTR's was not willful. The government objected that the testimony was not relevant to Weaner or McDonald's willfulness. The trial judge sustained the objection.

██ The trial judge has broad discretion in admitting or excluding expert testimony, and his action is to be upheld unless manifestly erroneous. *United States v. Costa,* 691 F.2d 1358, 1361 (11th Cir.1982). We find no error here. The evidence was not relevant on the willfulness issue. As we have discussed, willfulness required the knowing failure to obey the law, with the specific intent to disobey the law. Whether the appellants knew that other bankers disobeyed the law was not relevant to whether they acted knowingly in failing to file the forms or whether they acted with specific intent to ignore the law.

### II.

#### A. The Conspiracy Acquittals

Sans' first claim is based on a theory that one cannot be guilty of a conspiracy to

---

9. In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

10. Even taken as the defendants probably meant it, the third sentence was largely an incorrect statement of the law in this case. It comes from a case, *United States v. Schnaiderman,* 568 F.2d 1208 (5th Cir.1978), in which a Venezuelan tourist was carrying a large sum of money into the country. A customs officer asked the tourist if he understood U.S. currency laws. The tourist replied that he was aware of such laws but that he was going to spend the money gambling in Aruba two days later. The customs officer never asked about what, if any, specific currency laws the tourist was aware of. This court found the statement that he was aware of "U.S. currency laws" to be too vague and unspecific to constitute "knowledge" or provide a basis for a showing of willfulness within the meaning of the currency offenses charged. In this case, all defendants indicated a higher level of awareness than mere awareness of "U.S. currency laws" generally. The third sentence of the defendant's requested instruction is thus, at its best, a correct, but misleading and irrelevant, statement of the law.

11. These covered an examination of responsibilities a director would have in his position with the bank and would include operational accounting reviews of the bank's operation and a determination if the bank was in compliance with various laws and regulations.

commit an illegal act if the only party capable of committing the illegal act is acquitted of the conspiracy. Applying this theory, Sans observes initially that Weaner and McDonald were the only actors in this case with the legal duty to file CTR's and therefore the only ones capable of disregarding that duty. Because they were acquitted of conspiring to disregard that duty, he argues, he could not be guilty of conspiring with Cohen or anyone else to do so. We are not persuaded by Sans' theory.[12]

We first note that "failing to file" the CTR and causing the "failure to file" the CTR are really just two ways in which one offense can be consummated. Sans was capable of "failing to file" a CTR under 18 U.S.C. § 2(b) (1982), which provides that one who "willfully causes an act to be done which if directly performed by him *or another* would be an offense against the United States *is punishable as a principal*" (emphasis added). *United States v. Tobon-Builes*, 706 F.2d 1092, 1099 (11th Cir.1983), shows clearly that a person with no duty to disclose financial information or file currency transaction reports can be found guilty under section 2(b). This is so even if the one who actually performs the criminal act or omission has no criminal intent and is thus innocent of the substantive crime. *Tobon-Builes*, 706 F.2d at 1099. *See also United States v. Puerto*, 730 F.2d 627 at 631 (11th Cir., 1984).

*Tobon-Builes, id.*, cites with approval *United States v. Lester*, 363 F.2d 68 (6th Cir.1966) *cert. denied*, 385 U.S. 1002, 87 S.Ct. 705, 17 L.Ed.2d 542 (1967), which presented the precise issue Sans now raises. It involved application of section 2(b) in the context of a conspiracy where all of those who could have actually performed the illegal act charged as the object of the

conspiracy were acquitted. In that case, two private citizens were tried along with three police officers for conspiring willfully to deprive another private citizen of his fourteenth amendment rights under color of state law. The police officers were also charged with committing the substantive offense and the two private citizens with aiding and abetting them in committing that offense. 18 U.S.C. § 2 (1982) was not explicitly alleged in the conspiracy count of the indictment. The jury acquitted the police officers of the conspiracy and the substantive offense; it acquitted the two other men of aiding and abetting, but convicted them of the conspiracy. On appeal, the two men argued that because they could not have acted "under color of law," and thus could not have committed the substantive offense, they could not have conspired to commit that offense in violation of 18 U.S.C. § 371 (1982).

The *Lester* court, reading 18 U.S.C. § 2 (1976) into the conspiracy count, upheld the conspiracy convictions. It pointed out first that, "[i]n keeping with the provisions of § 2, it has long been held that [a count of] an indictment need not specifically charge 'aiding and abetting' or 'causing' the commission of an offense against the United States, in order to support a jury verdict based upon a finding of either." *Id.* at 72. The court then applied this principle to the conspiracy count as follows:

> So long as anyone who "willfully causes an act to be done" which, "if directly performed by him or another would be an offense against the United States", is punishable as a principal, it follows *a fortiori* that when two or more persons conspire willfully to "cause" an act forbidden by § 2(b), they *ex necessitate* conspire to "commit [an] offense against the United States" within the meaning of 18 U.S. § 371. *Id.* at 73.

The court cautioned:

> Of no consequence here is the fact that one reading the record before us might

---

**12.** To willfully fail to file, or cause the failure to file, CTR's with the second object of the conspiracy charged. If Sans' theory were correct, a conviction based on this object would be defective. The evidence was clearly sufficient to support a conviction based on either of the other two objections of the conspiracy, however. Thus, if we were to agree with Sans, we would remand the case for a new trial on the conspiracy count, with the second object deleted.

find it difficult, perhaps even impossible, to comprehend how the jury could have acquitted all the police officers of the conspiracy offense. It is not the province of the Court to inquire by what course of reasoning the jury may have reached seemingly inconsistent verdicts. Inconsistency of verdicts as to various defendants in a particular case has always been an exclusive prerogative of the jury. *Id.* at 74.

We agree with the *Lester* analysis. The second object of the conspiracy—the violation of the law requiring the filing of CTR's—must be read as having incorporated section 2(b).[13] Therefore, Sans could have been convicted of conspiring with Cohen to cause the failure to file the CTR's. Accordingly, the jury was entitled to find Sans guilty of the conspiracy even though it decided to acquit the bank officers.

### B. Prejudicial Evidence

Sans argues that the trial judge's admission of evidence of Leon Cohen's checkered past was erroneous because it was both irrelevant and overly prejudicial and denied him a fair trial. From time to time during the trial, the government introduced testimony and items of evidence that portrayed Cohen as a criminal. These items included newspaper articles, which detailed some of Cohen's criminal activity, taken from the records of the Palm State Bank. The articles were introduced to show that the bank and officers McDonald and Weaner knew, or at least had reason to believe, that Cohen was using the bank to launder his ill-gotten gains. The testimony of Cohen's criminal activity dealt mainly with his acquisition from Leslie Atkinson of the money he laundered at Palm State Bank. The testimony also suggested that Cohen had approached Wilton Chalmers about a possible loan from Chalmers' bank to set up a marijuana operation in Central America, and that Cohen had been convicted of impersonating a federal officer.

Sans objected to some of the newspaper articles and the testimony about Cohen's criminal activities on the ground that this evidence was irrelevant to any issue in the case. His objections were overruled. Determinations of the admissibility of evidence rest largely within the discretion of the trial judge and will not be disturbed on appeal absent a clear showing of abuse of discretion. *See United States v. Russell,* 703 F.2d 1243 (11th Cir.1983). We find no abuse of discretion in the trial judge's admission of the evidence to which Sans objected on relevancy grounds. The newspaper articles were relevant to the bankers' state of mind in entering into the Cohen currency transactions. Evidence of Cohen's trial for impersonating a federal officer in the Atkinson schemes corroborated Galkin's testimony about the scheme. Cohen's comment to Chalmers about the marijuana loan was relevant to the issue of Cohen's criminal intent regarding the conspiracy. Since Cohen was an alleged co-conspirator, his state of mind was relevant. Sans did not ask for any limiting instructions on any of this testimony.

Sans also presents a new argument on appeal, that the evidence showing Cohen to be a criminal was inadmissible because its probative value was substantially outweighed by its prejudicial effect. We review an objection not made at trial by a plain error standard. *See* Fed.R.Crim.P. 51, 52(b). Plain error is error which, when examined in the context of the entire case, is so obvious that [our] failure to notice it would seriously affect the fairness and integrity of judicial proceedings. *Russell,* 703 F.2d at 1248.

We find the trial judge's admission of the evidence not to be plain error. Evidence of Cohen's dealings with Leslie Atkinson was necessary to show where Cohen obtained the large sums of money that he endeavored to launder through the Palm

---

**13.** Here, as in *Lester* the substantive offenses charged violations of 18 U.S.C. § 2 (1982), but the conspiracy charge failed to mention that section.

State Bank, and the amount he needed to dispose of. Most of the evidence of Cohen's criminal activity was contained in the newspaper articles with which the prosecution showed the bankers to have come in contact. These articles were clearly admissible; as we have noted, they were important for the jury to consider in determining the bankers' state of mind in dealing with Cohen and processing the illicit transactions for him. The prosecution argued to the jury only that it should use the articles in considering Weaner's and McDonald's states of mind. All the "prejudicial" information had substantial probative value. It showed Cohen's acquisition of a large sum of money that required laundering, his trouble with Atlanta banks due to his past criminal conduct, his according need to go out-of-state to launder money, and Weaner and McDonald's state of mind in conducting the transactions. Any improper prejudicial effect of this evidence was minimized by the prosecutor's closing argument to the jury in that he drew only the proper inferences from the evidence.

Sans also argues that he moved for a severance because of the likelihood that evidence against Leon Cohen would be overly prejudicial, and the district court erroneously denied the motion. It is unclear whether Sans actually had a motion for severance before the court; his attorney merely filed a statement that he joined in other defendants' motions. At the time, Weaner and McDonald had pending a motion for a severance on the ground that information at trial regarding Cohen *and* Sans would be overly prejudicial. The trial court, ruling on the motion, stated that only Weaner and McDonald sought the severance; we find no evidence in the record that Sans took issue with that determination or requested a ruling on "his" motion for a severance. If he was a party to the severance motion, its denial was appropriate as to him in any event.

The decision to sever is discretionary; an appellant must show an abuse of discretion in denying the motion to sever and can do so only by demonstrating "compelling prejudice." *See United States v. Capo*, 693 F.2d 1330 (11th Cir.1982) *cert. denied* —— U.S. ——, 103 S.Ct. 1793, 76 L.Ed.2d 359. "Compelling prejudice" means that the jury will not be able to "collate and appraise the independent evidence against each defendant.... [T]hough the task be difficult [unless the jury is unable to perform it] severance should not be granted." *Tillman v. United States*, 406 F.2d 930, 935 (5th Cir.), *vacated in part on other grounds* 395 U.S. 830, 89 S.Ct. 2143, 23 L.Ed.2d 742 (1969). Coconspirators should be tried jointly in the interests of judicial economy, and severance is not warranted even if a defendant participated in only a single aspect of the conspiracy. *See United States v. Marszalkowski*, 669 F.2d 655, 659–60 (11th Cir. 1982) *cert. denied sub. nom Brock v. United States*, 459 U.S. 906, 103 S.Ct. 208, 74 L.Ed.2d 167. Applying these principles to Sans' case, even if he was included in the Weaver-McDonald motion for a severance, that motion was properly denied as to him. He shows no "compelling prejudice"; the jury was certainly able to distinguish what was necessary for his conviction of conspiracy from what was not.

### C. The Conspiracy—Felony or Misdemeanor

The conspiracy statute, 18 U.S.C. § 371 (1982), subjects to criminal liability two kinds of conspiracies: (1) conspiracies "to defraud the United States, or any agency thereof in any manner or for any purpose"; and (2) conspiracies "to commit any offense against the United States." If such an offense is a misdemeanor, the punishment for such conspiracy cannot exceed the maximum punishment provided for such misde-

meanor.[14] Sans argues that the first object of the conspiracy count described a misdemeanor offense rather than a felony. Since the jury could have convicted him on that object, he asserts, the maximum sentence he could have received was that for a misdemeanor conspiracy rather than that for a felony conspiracy.[15] Since we disagree with his premise, we uphold the sentence imposed.[16]

The conspirators' first objective was "[t]o unlawfully, knowingly, and intentionally defraud the United States ..." by impairing the IRS' ability to collect the data that would have been in the CTR's that should have been filed following the currency exchanges in question. Sans argues that a conspiracy to fail to file CTR's cannot rise to the level of a conspiracy to defraud the United States. Rather, he argues, the indictment alleged only a conspiracy to commit the misdemeanor offense of failing to file CTR's. We do not find this argument convincing. A conspiracy to fail to file CTR's can amount to a conspiracy to defraud the United States.

*United States v. Burgin*, 621 F.2d 1352 (5th Cir.), *cert. denied* 449 U.S. 1015, 101 S.Ct. 574, 66 L.Ed.2d 474 (1980), discusses the broad sweep of allowable conspiracies "to defraud the United States" under section 371. The court, citing *Dennis v. United States*, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966), noted that the conspiracy-to-defraud language reaches "any conspiracy for the purpose of impairing, obstructing, or defeating the lawful function of any department of government." 621 F.2d at 1356. The *Burgin* court also quoted *Hammerschmidt v. United States*, 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968 (1924) as follows:

> To conspire to defraud the United States means primarily to cheat the government out of property or money, *but it also means to interfere with or obstruct one of its lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest.* It is not necessary that the government shall be subjected to property or pecuniary loss by the fraud, but only that its legitimate official action and purpose shall be defeated by misrepresentation, chicane, or the overreaching of those charged with carrying out the governmental intention. (emphasis added).

The first conspiracy object alleged certainly met the criteria expressed in *Burgin*. It involved the dishonest impeding of a lawful governmental function. As the government points out, by submitting the fraud charge to the jury instead of charging simple conspiracy to commit a misdemeanor, it increased its own burden of proof. The jury was required to find the

---

**14.** Section 371 provides:
> Conspiracy to commit offense or to defraud United States
> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.
> If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.

**15.** He received an indeterminate three-year prison sentence under 18 U.S.C. § 4205(b)(2) (1982).

**16.** There is some question as to whether Sans properly preserved this point for appeal. At the charge conference prior to closing arguments, the parties discussed using a special verdict form showing separate verdicts for each object of the conspiracy. During the discussion, Sans' attorney stated that he thought the first conspiracy objective was the commission of a misdemeanor, and asked what the others thought. The court and the government stated that it was a felony. The attorney did not mention the point again. After the jury retired, the court asked counsel about their record objections to the court's jury instructions, and Sans' counsel stated that he adopted the objections "and comments" he had made at the charge conference. The misdemeanor/special verdict forms issue might arguably be such a "comment."

fraud element rather than just an agreement to fail to file CTR's. Accordingly, we find no error in the government's proceeding under the conspiracy-to-defraud theory, or to Sans' sentence. Whether guilty of joining in the conspiracy to defraud or either of the two other objects of the conspiracy in this case, Sans was subject to being sentenced under section 371 to five years in prison, or a $10,000 fine, or both. His sentence was within these bounds.

AFFIRMED.