**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Abelardo VALDES–GUERRA,
Defendant-Appellant.**

**No. 83–5691.**

United States Court of Appeals,
Eleventh Circuit.

April 25, 1985.

Richard A. Hamar, Miami, Fla., for Valdes-Guerra.

Stanley Marcus, U.S. Atty., Linda Collins Hertz, Kenneth F. Noto, Lawrence H. Sharf, Asst. U.S. Attys., Miami, Fla., for United States.

* Honorable J. Smith Henley, U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

Before VANCE and ANDERSON, Circuit Judges, and HENLEY *, Senior Circuit Judge.

HENLEY, Senior Circuit Judge:

Abelardo Valdes-Guerra (Valdes) was convicted on one count of a conspiracy to violate the currency reporting provisions of 31 U.S.C. § 5316, and conspiracy to defraud the government. See 18 U.S.C. § 371. He appeals contending that he is guilty of no more than a misdemeanor because the evidence only shows he agreed to violate § 5316 one time and thus the enhancement provision, § 5322(b), is inapplicable. He also urges us to construe section 5322(b) to apply only to situations where there is other illegal activity involved which is separate and apart from the underlying reporting violations. Finally, he argues that the admission of certain evidence and the use of improper closing argument deprived him of a fair trial. We affirm the judgment of the district court.[1]

The evidence which was used to convict Valdes was gathered in a federal undercover "sting" operation called "Operation Greenback," the purpose of which was to investigate the unreported transportation of United States currency to points outside the United States. In this operation, federal agents assumed the roles of wealthy Saudi Arabians who needed to have millions of dollars secreted to Central America and returned to the United States in disguised form.

Pedro Llaguno, a Miami attorney, was introduced to Customs Services Agent Valasco, who was posing as an Arab prince. This and a number of subsequent meetings were taped at a hotel suite ostensibly occupied by Saudi royalty. The "Shiek" told Llaguno he needed millions of dollars in United States currency shipped out of the

1. The Honorable Edward B. Davis, United States District Judge, Southern District of Florida.

country on a regular basis. Llaguno later introduced Valasco to Alfredo Perez-Casellas (Casellas), a Panamanian lawyer, and the group discussed using a Panamanian cargo airline to transport the money. Casellas was to establish a Panamanian corporation with a corporate bank account at a Panamanian bank. After the money was deposited in the account, it would be returned to the United States in the form of "loans." Shipments of approximately two million dollars a week were contemplated.

Further details of this scheme were discussed at subsequent meetings, including the fact that a 5% commission needed to be paid to the "air cargo" people. Llaguno and Casellas assured the agents that this method of transportation was safe, that the airline people had never had any problems before, and that there would be no difficulties with anyone in Panama. Llaguno and Casellas indicated, however, that the airline people wanted shipments to take place only once every two or three weeks, rather than weekly. The agents were to be introduced to the airline officials upon their arrival from Panama.

On May 18, 1983 Llaguno told the agents that both the owner of INAIR, the Panamanian airline, and the individual who would actually handle the transportation had arrived in Miami. Later that day, the federal agents met with Llaguno, Casellas, INAIR President Jorge Solis-Krebs (Solis), and INAIR General Manager Valdes at the hotel room. Solis and Valdes both acknowledged that their role in the scheme was to provide the transportation of the money, using their connections in Panama to avoid detection. They were told that on "this trip" two million dollars would be shipped. Although both Solis and Valdes indicated that they had never done this before, Valdes stated there would be no problems because he knew how to handle it.

The group also discussed the mechanics of the transportation and the commission which was to be paid. Agent Nemore noted that this was just the first of weekly shipments and that it was a "test" run.

No government forms were to be filled out and Valdes was to meet the plane at the airport in Panama. Valdes assured the agents he had connections at the airport and that therefore the military guards at the gates would pose no problems. Valdes told Nemore, who was to be on the flight, not to act suspicious and to "act natural." The money was to be placed in air cargo boxes labeled as automobile parts.

Valdes, Solis, Llaguno and Casellas were arrested immediately following the May 18 meeting. Although he at first denied involvement, Valdes acknowledged his participation in the scheme after being told the meeting had been videotaped. He stated that Casellas had approached him in December of 1982 when the two had discussed the possibility of using INAIR to ship currency out of the United States. Nothing further had come of these discussions until May of 1983 when Casellas called Valdes indicating that such a deal was being planned.

Valdes was tried separately on one count of conspiracy after his motion to sever his case from the other defendants was granted by the district court. He was convicted after a jury trial and sentenced to six months imprisonment to be followed by three years of probation.

Federal law requires a person to file a report when he or she transports currency of a value exceeding $5,000.00 outside the country. *See* 31 U.S.C. § 5316 (Bank Secrecy Act). Violation of section 5316 is generally a misdemeanor. *See* 31 U.S.C. § 5322(a). However, if the reporting violation is done "while violating another law of the United States or as a part of a pattern of illegal activity involving transactions of more than $100,000 in a 12-month period," it is a felony. 31 U.S.C. § 5322(b).

The government seeks to invoke the felony enhancement provision contained in section 5322(b) by arguing that Valdes agreed to assist in a series of reporting violations involving over $100,000.00 which therefore constitutes a pattern of illegal activity. Valdes contends that the pattern of illegal activity referred to in the statute must be

illegal activity apart from the reporting violations. Valdes asserts that since there was no independent illegal activity in this case, he is only guilty of conspiracy to commit a series of misdemeanors.[2]

■ We disagree with Valdes' interpretation of the statute. While there is little caselaw construing the phrase "pattern of illegal activity," both circuits which have directly confronted the issue have held that a series of currency reporting violations which, by themselves, constitute only misdemeanors may also be felonious if they show a pattern of illegal activity and exceed $100,000.00 over a twelve-month period. *United States v. Dickinson,* 706 F.2d 88, 91–93 (2d Cir.1983); *United States v. Beusch,* 596 F.2d 871, 878–79 (9th Cir. 1979). We agree with those courts that the legislative history of section 5322(b) evinces an intent not only to deal seriously with reporting violations undertaken in conjunction with violations of other federal laws, but also to punish as a felony violations undertaken in a repeated manner which "involve very large sums of money." H.R. Rep. No. 91–975, 91st Cong., 2d Sess. (1970), 1970 U.S.Code Cong. & Ad.News 4394, 4406. Congress intended that "serious violations *under this title*" could not "be shrugged off as a mere cost of doing business." *Id.* (emphasis added); *Dickinson,* 706 F.2d at 92.

This interpretation of the statute is in accord with the reading given it by this circuit in *United States v. Kattan-Kassin,* 696 F.2d 893 (11th Cir.1983). There, the court held that each reporting violation could be prosecuted as a separate felony where each violation was part of a pattern of illegal activity meeting the monetary and time thresholds. While it did not directly address the precise issue presented here, the court appeared to imply that a series of misdemeanor violations could constitute felonies in appropriate circumstances.

Finally, the interpretation offered by Valdes would seem to render a portion of the statute superfluous since the sentence prior to the "pattern" language already makes it a felony to violate the Bank Secrecy Act "while violating another law of the United States." There is no indication in the legislative history that the "illegal activity" language meant violations of state or local law. *Dickinson,* 706 F.2d at 92. *Cf. United States v. Beusch,* 596 F.2d at 880 (Bright, J., dissenting in part). We therefore reject Valdes' contention that there must be independent illegal activity involved in order for the enhancement provision to apply.[3]

Valdes also contends that the evidence is insufficient to sustain the felony conviction. He argues there is no evidence that he intended or agreed to commit multiple violations of the Act. Therefore, he asserts he lacked the specific intent to violate

---

**2.** There was no evidence that the transportation of the money was to be done "while violating another law of the United States" and hence the government does not rely on this language to enhance Valdes' conduct to a felony. We also note that Valdes does not dispute the fact that the transaction involved "more than $100,000 in a 12-month period." As stated, two million dollars were to be transported on the first shipment alone.

**3.** It is at least arguable that Valdes' conviction could be upheld as a felony with reference to 18 U.S.C. § 371, which makes it a felony to conspire to defraud the government. A conspiracy to impair the lawful government function of collecting data and reports of currency transactions in excess of $10,000.00 may in some circumstances constitute a conspiracy to defraud the government. *See United States v. Sans,* 731

F.2d 1521, 1533–35 (11th Cir.1984). Here, the government charged both a conspiracy to commit multiple violations of the currency reporting provisions and a conspiracy to defraud the government. The jury was instructed that if it found the elements of either one of the conspiratorial purposes to be present, it could find Valdes guilty of a felony. " 'It has always been the law that where an indictment alleges a conspiracy to commit several offenses against the United States, *the charge is sustained by adequate pleadings and proof of conspiracy to commit any one of the offenses.*' " *United States v. Johnson,* 713 F.2d 633, 646 (11th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1447, 79 L.Ed.2d 766 (1984) (quoting *United States v. James,* 528 F.2d 999, 1014 (5th Cir.), *cert. denied,* 429 U.S. 959, 97 S.Ct. 382, 50 L.Ed.2d 326 (1976)).

section 5316 as part of a pattern of illegal activity.

■ Conspiracy is a crime "the essence of which is an agreement to commit an unlawful act." *Iannelli v. United States*, 420 U.S. 770, 777, 95 S.Ct. 1284, 1289, 43 L.Ed.2d 616 (1975). The government must establish that a conspiracy to commit a crime existed and that the accused knew its essential objectives and voluntarily agreed to assist in the venture. *United States v. Elledge*, 723 F.2d 864, 866 (11th Cir.1984); *United States v. Lippner*, 676 F.2d 456, 466 (11th Cir.1982). The agreement may be proved by direct evidence or may be inferred from the circumstances as a whole. *United States v. Browning*, 723 F.2d 1544, 1546 (11th Cir. 1984); *United States v. Hartley*, 678 F.2d 961, 969 (11th Cir.1982), *cert. denied*, 459 U.S. 1170, 103 S.Ct. 815, 74 L.Ed.2d 1014 (1983). A conspiracy conviction may be sustained even though the accused did not know all of the details of the agreement or all the other conspirators and even if he played only a minor role in the scheme. *Browning*, 723 F.2d at 1546; *United States v. Solomon*, 686 F.2d 863, 869 (11th Cir.1982).

■ Here, we believe sufficient evidence was presented by the government to show that Valdes agreed to assist in the illegal scheme with knowledge that multiple shipments were contemplated. The discussion prior to the meeting on May 18, 1983 clearly shows that the parties intended the shipments to be ongoing. Casellas and Llaguno indicated that using INAIR and Valdes to transport the money was "proven and safe." They stated that the "air cargo" people were willing to make regular shipments. Moreover, Valdes' statements at the May 18 meeting allow the inference that he had had prior discussions with Casellas concerning the scheme. The jury could permissibly infer that all aspects of the conspiracy, including future shipments, had previously been discussed between the

two. Agent Nemore specifically stated in Valdes' presence that this was just the first of weekly shipments and referred to it as a "test" run. Two million dollars were to be transported "this trip."

Evidence is sufficient if a "reasonable trier of fact" could have found guilt beyond a reasonable doubt. *United States v. Bell*, 678 F.2d 547, 549 (5th Cir. Unit B 1982) (en banc), *aff'd on other grounds*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). Viewing the facts and the inferences that may be drawn from it in the light most favorable to the government, *id.*, we believe that a reasonable juror could conclude that Valdes knew that multiple shipments were within the scope of the agreement and that he voluntarily agreed to aid and assist in this objective. The extent of Valdes' knowledge and intent was a jury question.

■ Valdes' other claims of error are without merit. He contends that the admission into evidence of a business card which was found on his person following his arrest justifies a new trial since it was inadmissible hearsay. The district court at first allowed the card into evidence and then reversed its ruling and told the jury to disregard it. Even assuming the card was hearsay evidence, we cannot say its momentary admission deprived Valdes of a fair trial. Any prejudicial error was cured by the court's immediate and unequivocal cautionary instructions. The court was within its discretion in refusing to grant a mistrial.

Valdes next contends that the prosecutor's closing argument was improper. The prosecutor argued that this case was a "laundromat of greed." Valdes asserts that there was no evidence that the money to be transported came from an illegal source or needed to be "laundered," and that this comment was designed to inflame a Miami jury already sensitized to the use of such terms in connection with illegal drug transactions.

■ Prosecutors should refrain from using arguments which have no basis in the record and which are calculated to obtain a wrongful conviction. *See United States v. Vera,* 701 F.2d 1349, 1361 (11th Cir.1983). While a government attorney "may strike hard blows, he is not at liberty to strike foul ones." *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935); *United States v. Young,* —— U.S. ——, ——, 105 S.Ct. 1038, ——, 84 L.Ed.2d 1 (1985).

■ Here no foul blows were struck. The prosecutor did not say directly that the money came from a particular illegal source or was otherwise "dirty." Indeed, the term, "money laundering," would appear to be a permissible characterization of what Valdes had agreed to do and was not a gross misstatement of the facts. Agent Valasco used the phrase in his testimony without objection and greed was clearly the motive of the conspirators. Moreover, even assuming the argument was somewhat improper, it was not so egregious that it prejudicially affected Valdes' substantial rights. *See United States v. Zielie,* 734 F.2d 1447, 1460-61 (11th Cir.1984); *United States v. Kopituk,* 690 F.2d 1289, 1343 (11th Cir.1982), *cert. denied,* 463 U.S. 1209, 103 S.Ct. 3542, 77 L.Ed.2d 1391 (1983).

■ Finally, we reject Valdes' contention that he should have been allowed to argue that the government was required to prove an illegal act apart from a series of currency transfers. Defense counsel may not argue incorrect or inapplicable theories of law to a jury. "[C]ounsel is confined to principles that will later be incorporated and charged to the jury,." *United States v. Trujillo,* 714 F.2d 102, 106 (11th Cir. 1983); *see United States v. Scales,* 599 F.2d 78, 81 (5th Cir.1979). Such arguments should be directed to the court, not the jury. In any event, we have already stated that Valdes' interpretation of the statute is incorrect.

The judgment of conviction is affirmed.