[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 05-12835
Non-Argument Calendar
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JANUARY 25, 2007
THOMAS K. KAHN
CLERK

D. C. Docket No. 03-20483-CR-MGC

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

NOEL ROBERTS,
a.k.a. Casper,
a.k.a. Caspa,
a.k.a. Mark,
CAREY LEE WILLIAMS,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

**(January 25, 2007)**

Before BIRCH, PRYOR and FAY, Circuit Judges.

PER CURIAM:

Noel Roberts and Carey Lee Williams appeal their convictions and sentences for conspiracy to import and conspiracy to possess with intent to distribute cocaine, in violation of 21 U.S.C. §§ 846 and 963, and aiding and abetting the importation and the possession with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a) and 952(a).  On appeal, Williams challenges the district court's denial of his Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) challenges to the government's peremptory strikes of the petit jury, argues that the content of the prosecutor's objections constituted prosecutorial misconduct, and asserts that the district court abused its discretion by advising the jury to disregard portions of his closing argument.[1]  Roberts likewise raises a Batson claim and further argues that the district court clearly erred in enhancing his Guideline range for a supervisory or managerial role in the offense.  For the reasons set forth more fully below, we affirm.

---

[1] Stating that the following issues are raised pursuant to his duty under Anders v. California, 386 U.S. 738 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967) to inform the Court of any potentially appealable issues, Williams summarily argues that: (1) the waiver of his rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), was not voluntary; (2) the district court erred in allowing the government to raise his prior convictions in its opening statement; and (3) the admission of a statement by a codefendant, phone records, and a list of telephone numbers transcribed from a cell phone, violated Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).  We discern no error in the denial of Williams's motion to suppress his statements to law enforcement, no abuse of discretion by the district court in permitting the government to discuss prior convictions in its opening statement, and no plain error under Crawford.  We note that Williams's counsel has not filed a formal motion to withdraw under Anders.

## I.  Standard of review

We review the district court's resolution of a <u>Batson</u> challenge for clear error, giving great deference to the district court's finding as to the existence of a <u>prima facie</u> case.  <u>Central Ala. Fair Housing Ctr., Inc. v. Lowder Realty Co., Inc.</u>, 236 F.3d 629, 635 (11th Cir. 2000).  We review  "a prosecutorial misconduct claim <u>de novo</u> because it is a mixed question of law and fact."  <u>United States v. Eckhardt</u>, 466 F.3d 938, 947 (11th Cir. 2006).  We review the district court's limitation of a closing argument for abuse of discretion.  <u>See</u> <u>United States v. Hall</u>, 77 F.3d 398, 400-01 (11th Cir. 1996).  We review for clear error a district court's determination of a defendant's role in the offense.  <u>United States v. De Varon</u>, 175 F.3d 930, 937 (11th Cir. 1999) (<u>en banc</u>).

## II.  <u>Batson</u>

Roberts argues that the striking of five black jurors was, in and of itself, sufficient to establish a <u>prima facie</u> case under <u>Batson</u> and Williams similarly argues that he made a  <u>prima facie</u> showing of a pattern of strikes against black jurors.  They make further arguments regarding the court's failure to require the prosecutor to state a race-neutral explanation for each strike and the adequacy of the reasons proffered by the prosecution.  The government responds that defendants never made a <u>prima facie</u> showing before the district court.

3

The district court conducts a three-part inquiry into whether a peremptory strike was motivated by racial or ethnic discrimination. United States v. Ochoa-Vasquez, 428 F.3d 1015, 1038 (11th Cir. 2005), cert. denied, 127 S.Ct. 380 (2006). "First, the district court must determine whether the party challenging the peremptory strikes has established a prima facie case of discrimination by establishing facts sufficient to support an inference of racial discrimination." Id. (citation and quotation marks omitted). The district court reaches the next part of the inquiry only if a prima facie case is established. See id. In the second part of the inquiry, the burden shifts to the party making the strike to provide a race-neutral explanation for the strike. Id. Regardless of the frivolity of the justification, the inquiry proceeds to step three, where "the district court determines the persuasiveness of the justification offered by the striker and decides whether the objector has carried its burden of proving purposeful discrimination." Id. at 1038-39.

The district court should determine whether a prima facie case is established based on the totality of relevant facts about the prosecutor's conduct. Atwater v. Crosby, 451 F.3d 799, 805 (11th Cir. 2006), pet. for cert. filed, (U.S. Oct. 25, 2006) (No. 06-7287). Engaging in a pattern of strikes against venire members of one race may support a prima facie case of racial discrimination. Ochoa-Vasquez,

4

428 F.3d at 1039.  However, "a showing that a party used its authorized peremptory strikes against jurors of one race does not, standing alone, establish a prima facie case of discrimination." Lowder, 236 F.3d at 637.  The factors we have considered to provide context to the use of peremptory strikes against jurors of one race include whether jurors of the same race served unchallenged on the jury, whether the striking party struck all people, or as many people as the striker had strikes, of the same race from the venire, and the existence of a substantial disparity between the percentage of jurors of that race struck and their representation on both the venire and the jury. Ochoa-Vasquez, 428 F.3d at 1044-45.

The defendants raised Batson challenges to three individual peremptory strikes by the government.  They also raised a challenge to the entire panel, arguing that all five of the government's strikes were for black jurors.  All four challenges were summarily denied by the district court.  Given the context of the court's denials, we conclude that these denials were based on the defendants' failure to establish a prima facie case.  We hold that the district court did not clearly err in this finding.   Both before the district court and on appeal, the defendants have based their prima facie case on evidence that the government used all five of its peremptory strikes on the initial 12 jurors to strike black venire members.  At

5

neither stage in the proceedings have they attempted to place this fact in context.

As a result, their argument is insufficient to establish a prima facie case. See

Lowder, 236 F.3d at 637. Moreover, to the extent that the record does provide

context, it does not support a finding that the district court clearly erred. Based on

the government's representations, which were not disputed before the district

court, the government accepted two black jurors, who were subsequently struck by

the defendants, and three black jurors served on the jury. In addition, the

government used only five of its six peremptory challenges to the petit jury and,

therefore, could have struck an additional black juror from the venire. See

Fed.R.Crim.P. 24(b)(2).

### III. Prosecutorial misconduct

Williams next argues that the government made disparaging remarks to the

effect that his counsel was "twisting testimony and transcripts."

> To establish prosecutorial misconduct, (1) the remarks must be
> improper, and (2) the remarks must prejudicially affect the substantial
> rights of the defendant. A defendant's substantial rights are
> prejudicially affected when a reasonable probability arises that, but for
> the remarks, the outcome of the trial would have been different. When
> the record contains sufficient independent evidence of guilt, any error
> is harmless.

Eckhardt, 466 F.3d at 947 (citations and quotation marks omitted). If the remarks

are improper, "reversal is only warranted if the entire trial is so replete with errors

6

that [the defendant] was denied a fair trial." Id.

In McLain,[2] we held that prosecutorial misconduct occurred where, in the jury's presence, the prosecutor repeatedly accused defense counsel of intentionally misleading jurors and witnesses and of lying in court. McLain, 823 F.2d at 1462. In another case, we rejected a claim of prosecutorial misconduct based on five comments during a rebuttal argument where the prosecutor stated, inter alia, that the lawyers misstated the evidence, called witnesses liars with no basis in fact, and that, "one day there is going to be a great book of fiction entitled lawyers [sic] closing arguments." United States v. Calderon, 127 F.3d 1314, 1336 (11th Cir. 1997) (alteration in original).

Williams's claim of prosecutorial misconduct is based on one objection by the prosecutor to questioning concerning a witness's explanation of her testimony in a prior trial during which the prosecutor stated, "I don't think it's a proper twist of the transcript[,]" and four sustained objections to questions asked by Williams's counsel to one of the government's witnesses on cross-examination in which the prosecutor asserted that the testimony was misstated. We hold that the challenged remarks are more like those in Calderon than those in McLain and, therefore, there

---

[2] United States v. McLain, 823 F.2d 1457, 1462 (11th Cir. 1987), overruled on other grounds by United States v. Lane, 474 U.S. 438, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986), as recognized in United States v. Watson, 866 F.2d 381 (11th Cir. 1989).

was no prosecutorial misconduct in this case.

Even if the prosecutor's statements rose to the level of prosecutorial misconduct, they did not deprive Williams of a fair trial. In McLain, the prosecutor's repeated accusations that defense counsel intentionally misled jurors and witnesses and lied in court was insufficient, standing alone, to warrant reversal. McLain, 823 F.2d at 1462. It therefore follows that the prosecutor's objections here are also insufficient to warrant reversal.

## IV. Limitation of closing argument

Reasoning that providing awareness of a sentence to the jury is proper, Williams next argues that the district court erred by informing the jury not to consider his counsel's arguments regarding punishment, as it effectively diluted his closing argument and undermined counsel's credibility. During his closing arguments, Williams's counsel argued:

> I submit to you the government has fallen short with respect to producing evidence from which they will ask the judge to sentence my client to eternal imprisonment, the statutory maximum that can be imposed would be life in prison.
> Ladies and gentlemen, do not throw Mr. Williams any kind of bone here. If you are going to convict him, just knock him out with all four counts. Do not split the baby in half. Because any one count–

At this point, the prosecution objected and was overruled. Counsel then continued:

> There are four Counts, convicting him of one is the same as convicting him of four. I am asking you to not split the baby. It

8

makes no difference at all. This is an all or nothing proposition. He is either guilty as charged or not guilty as charged. All or nothing.

"The district court has broad discretion over closing argument and will be reversed only if counsel is prevented from making all legal arguments supported by the facts." Hall, 77 F.3d at 400. "In arguing the law to the jury, counsel is confined to principles that will later be incorporated and charged to the jury." United States v. Trujillo, 714 F.2d 102, 106 (11th Cir. 1983). Counsel cannot argue incorrect or inapplicable theories of law. United States v. Valdes-Guerra, 758 F.2d 1411, 1416 (11th Cir. 1985). We do not permit defense counsel to make a nullification argument to the jury, recognizing "that [while] a jury may render a verdict at odds with the evidence or the law, neither the court nor counsel should encourage jurors to violate their oath." Trujillo, 714 F.2d at 106 (footnote omitted). Moreover, the Supreme Court has recognized that "providing jurors sentencing information invites them to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion." Shannon v. United States, 512 U.S. 573, 579, 114 S.Ct. 2419, 2424, 129 L.Ed.2d 459 (1994).

The jury was instructed that it should never consider the question of punishment in deciding the case. Williams requested that the jury convict him of either all counts or no counts immediately after informing the jury that the

9

government would ask the judge to sentence him to "eternal imprisonment." Based on the context in which Williams made the "splitting the baby" argument, the district court did not abuse its discretion in concluding that it was intertwined with the comments regarding punishment. Therefore, by seeking to provide information on punishment to the jury, Williams's argument contravened the instruction regarding punishment and implicitly encouraged jurors to violate their oath. Accordingly, the district court did not abuse its discretion by instructing the jury to disregard portions of Williams's closing argument.

## V. Role enhancement

The conspiracy at issue in this case involved the smuggling of cocaine on and off of cruise ships. As to the April 2003 cruise, Roberts argues that his actions, arranging hotel accommodations, providing spending money and money to change an airplane ticket, and providing a ride to the flea market, were insufficient to warrant a role adjustment. He contends that the four couriers on the cruise were repeat couriers who needed no instruction from him and there was no evidence that he provided them with contact information or telephone numbers to complete their roles on the cruise.

Section 3B1.1(b) of the U.S. Sentencing Guidelines provides for a three-level enhancement if a "defendant was a manager or supervisor (but not an

10

organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive . . . ." U.S.S.G. § 3B1.1(b). Among other factors, the court should consider the nature of participation in the commission of the offense, the nature and scope of the illegal activity, the degree of participation in planning or organizing the offense, and the degree of control and authority exercised over others. U.S.S.G. § 3B1.1, comment. (n.4). "In a drug distribution case such as this one, the management enhancement is appropriate for a defendant who arranges drug transactions, negotiates sales with others, and hires others to work for the conspiracy." United States v. Matthews, 168 F.3d 1234, 1249-50 (11th Cir. 1999) (affirming role enhancement where the defendant sold cocaine to "runners" who, in turn, sold cocaine to buyers).

The district court did not clearly err in finding that Roberts's responsibilities regarding the couriers was managerial activity that warranted a three-level increase. The testimony of Christopher Brown, one of the couriers on the April 2003 cruise, established that Roberts did more than simply provide transportation and accommodation to the four drug couriers. Roberts told the couriers what to buy at the flea market, how to act on the cruise, and where to obtain the cruise tickets. He also told them that they would pick up the drugs in Curacao and that someone working on the ship would take the drugs. In addition, Roberts provided

11

the couriers with money to meet their needs both before and on the cruise, including $6,000 to spend on the cruise and a few hundred dollars to allow Brown to change his plane ticket. Additional evidence of Roberts's role regarding this cruise comes from Roberts's statement to Oraine Selvin, a cooperating witness for the government, that Roberts was taking care of the cruise. There is also evidence of communications between Roberts and phone numbers in Aruba, Curacao, and the cell phone of one of the couriers shortly before and during the cruise, and evidence of multiple phone calls Roberts placed to a number associated with codefendant Andre Dougan the day the cruise members were arrested.

In light of the foregoing, Roberts and Williams's convictions and sentences are

**AFFIRMED.**