**UNITED STATES of America**

**v.**

**Ocie MILLS and Carey C. Mills.**

**PCR No. 88–03100–RV.
PCA No. 91–30428–RV.**

United States District Court,
N.D. Florida,
Pensacola Division.

March 31, 1993.

---

Samuel A. Alter, Jr., Supv. Asst. U.S. Atty., for U.S.

Ronald W. Johnson, Kinsey, Troxel, Johnson & Walborsky, P.A., Pensacola, FL, for Ocie and Carey Mills.

## ORDER

VINSON, District Judge.

This cause comes on for consideration upon the magistrate judge's report and recommendation dated June 26, 1992. All parties have been furnished copies of the report and recommendation and have been afforded an opportunity to file objections, pursuant to Title 28, United States Code, Section 636(b)(1). Subject to the following discussion, the report and recommendation is adopted, incorporated into, and made a part of this order.

**1548**

## I. BACKGROUND

This case presents the disturbing implications of the expansive jurisdiction which has been assumed by the United States Army Corps of Engineers under the Clean Water Act. In a reversal of terms that is worthy of *Alice in Wonderland,* the regulatory hydra which emerged from the Clean Water Act mandates in this case that a landowner who places clean fill dirt on a plot of subdivided dry *land* may be imprisoned for the statutory felony offense of "discharging pollutants into the navigable *waters* of the United States."

The movants, Ocie Mills and Carey C. Mills, father and son, were found guilty in a 1989 jury trial of five counts of discharging pollutants into the waters of the United States without a permit, in violation of Sections 301(a) and 309(c) the Clean Water Act, Title 33, United States Code, Sections 1311(a) and 1319(c).[1] The two Millses were also found guilty of a misdemeanor offense of unlawfully excavating a canal (the drainage ditch between Lots 19 and 20) in the navigable waters of the United States, in violation of Sections 10 and 12 of the Rivers and Harbors Act, Title 33, United States Code, Sections 403 and 406. Their prosecution and conviction stemmed from their attempt to prepare for building on two waterfront lots (Lots 20 and 21) on Escambia Bay which they purchased in 1986. One lot (Lot 21) was deemed to be upland, but a significant portion of the other lot (Lot 20) was deemed by the Corps to be a "wetland." Although Lot 20 (like Lot 21) is a waterfront lot, it does not have the appearance of what most lay people think of as a "wetland." Prior to the events in question here, it was originally mostly wooded, with large pine, oak, gum, bay, and magnolia trees, as well as lots of smaller trees and shrubs. Some of these trees grow well in saturated soil conditions, while others do not. A relatively narrow strip of marsh grass along the bay beachline was not directly affected by the Millses' action in question. In its original natural state, the lot had a dish-shaped drain through the center that apparently carried rainwater run-off from inland to the bay, but it had no standing water on it, nor did it appear to be a marsh, swamp, or bog.

After their jury trial, the Millses were each sentenced by Senior Judge Winston E. Arnow of this Court to twenty-one months incarceration, followed by one year of supervised release. In addition, the court imposed a $5000 fine and a special monetary assessment of $250 on each defendant and required the defendants to comply with a Site Restoration Plan. Following their convictions, the Millses filed a direct appeal. The convictions were summarily affirmed by the Eleventh Circuit Court of Appeals. *United States v. Mills,* 904 F.2d 713 (11th Cir.1990) (table).

In a separate subsequent proceeding regarding the Millses' Supervised Release and their obligations under the Site Restoration Plan, I held an extended evidentiary hearing. By order entered herein on December 24, 1991, I determined that the Millses had substantially complied with the Plan, and specifically, that the elevation requirements had all been met. One significant factual development from that proceeding was a determination that, at the time in question, the subject land (Lot 20) was probably not a "wetland" for purposes of the Clean Water Act. This was because, as a part of the subdivision development in 1978, a drainage that formerly ran through Lot 20 was offset about 45 feet by constructing a ditch between Lots 19 and 20, and the old drain through Lot 20 was blocked and partially filled by the developer.

---

1. There have been relatively few criminal prosecutions for violations of the Clean Water Act, and even fewer sentences of incarceration have been imposed. *See, e.g., United States v. Ellen,* 961 F.2d 462 (4th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 217, 121 L.Ed.2d 155 (1992) (defendant sentenced to six months imprisonment; *United States v. Holland,* 874 F.2d 1470 (11th Cir.1989)) (defendant sentenced to five years probation; probation revoked and six months imprisonment imposed when defendant violated conditions of probation); *United States v. Hoflin,* 880 F.2d 1033 (9th Cir.1989), *cert. denied,* 493 U.S. 1083, 110 S.Ct. 1143, 107 L.Ed.2d 1047 (1990) (sentence suspended; defendant placed on two years probation); *United States v. Frezzo Bros., Inc.,* 602 F.2d 1123 (3d Cir.1979), *cert. denied,* 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980) (corporate defendant fined; individual defendants fined and sentenced to thirty days in jail); *United States v. Pozsqai,* 757 F.Supp. 21 (E.D.Pa.1991) (defendant fined and sentenced to three years imprisonment).

Thus, the diversion of the drain and some filling on Lot 20 was apparently done before the effective date of the applicable Clean Water Act Regulations, and long before the Millses bought their lots in 1986. The Millses, who represented themselves without an attorney at their criminal trial, were not allowed to put on evidence about this, however. Although they challenged this on direct appeal, the Eleventh Circuit affirmed.

The two Millses have now moved to vacate, set aside, or correct their sentences, pursuant to Title 28, United States Code, Section 2255, and/or for a writ of error coram nobis. They have raised four grounds in support of the motion: (1) their convictions for violations of the Clean Water Act are void because Congress has unconstitutionally delegated its legislative authority to the United States Army Corps of Engineers; (2) they were selectively prosecuted; (3) they were denied due process when the trial court prevented them from presenting to the jury the defense of equitable estoppel; (4) there was insufficient evidence to establish that, at the time they placed fill and spoil material on their property, the property was a "wetland."

## II. DISCUSSION

Having considered the magistrate judge's report and recommendation and all objections thereto timely filed by the parties, I have determined that the recommendation should be adopted in part. Specifically, I adopt the recommendation of the magistrate judge that (1) the Millses have procedurally defaulted on the selective prosecution claim, and (2) the defenses of equitable estoppel and sufficiency of the evidence were fully disposed of on direct appeal and, therefore, are not cognizable under Section 2255. As questionable as it now may be, the factual basis of their convictions and the sufficiency of the evidence at their trial were previously affirmed by the Eleventh Circuit, and are not subject to further review by this Court. However, the Millses' contention that the

Clean Water Act unconstitutionally delegates power to the United States Army Corps of Engineers (the "Army Corps") merits additional discussion.

■ As a threshold matter, I note that the Millses failed to raise this constitutional challenge to the Clean Water Act earlier, both in the proceedings before the trial court and on direct appeal.[2] Thus, they procedurally defaulted on the delegation challenge. Generally, the failure to raise a constitutional issue on direct appeal bars a movant from raising the same issue in a Section 2255 proceeding. *Greene v. United States*, 880 F.2d 1299, 1305 (11th Cir.1989), *cert. denied*, 494 U.S. 1018, 110 S.Ct. 1322, 108 L.Ed.2d 498 (1990); *Parks v. United States*, 832 F.2d 1244, 1245 (11th Cir.1987). Movants can avoid this procedural bar only by showing cause for the failure to raise the claim on direct appeal and actual prejudice resulting from the failure. *United States v. Frady*, 456 U.S. 152, 167–68, 102 S.Ct. 1584, 1594–95, 71 L.Ed.2d 816, 830 (1982); *Greene v. United States, supra*, 880 F.2d at 1305.

The Millses make no attempt to show cause for not raising this constitutional challenge earlier. Instead, they argue that to be incarcerated for violating a criminal provision which is void results in a fundamental miscarriage of justice. According to the Millses, such exceptional circumstances excuse their procedural default.

■ The Millses are correct that, in certain exceptional circumstances, procedural default may be excused in order to avoid a "fundamental miscarriage of justice." *Gonzalez v. Abbott*, 967 F.2d 1499, 1504 (11th Cir.1992). In *Gonzalez v. Abbott, supra*, a challenge to a conviction was raised in a habeas petition which had not been raised at trial or on direct appeal. The petitioner in that case was incarcerated pursuant to a conviction for conspiracy to traffic in cocaine. *Id.*, 967 F.2d at 1500. The petitioner challenged his conviction on the grounds that,

2. On direct appeal, the Millses raised vagueness and overbreadth challenges to the constitutionality of 33 U.S.C. § 1311, which prohibits the discharge of pollutants except in compliance with the Clean Water Act. The Mills argued that Section 1311 is "so vague and broad that it

encompasses legal conduct which subjects its enforcement to arbitrary and discriminatory enforcement. It is so vague that a person of ordinary intelligence cannot determine what is prohibited." (Doc. 113, Appellant's Br. at 42–43).

prior to the conviction becoming final, the state legislature had repealed the statute creating the substantive offense—trafficking in cocaine—upon which the conspiracy conviction was based. Thus, according to the petitioner, the conspiracy conviction was void.

The district court held that the petitioner had procedurally defaulted on this claim by not raising it earlier, either at trial or on direct appeal. Reversing, the Court of Appeals held that "this claim, if legally founded, establishes that [the] ... conviction ... is void and cannot be a legal cause of imprisonment—notwithstanding any procedural default." *Id.*, 967 F.2d at 1504.

The Millses argue that the same principle excuses their procedural default. According to them, the provisions of the Corps' Regulations which they were convicted of violating are void, because Congress has unconstitutionally delegated its legislative power to the Army Corps of Engineers, an agency of the Executive Branch of government. Thus, the argument goes, a criminal conviction for violating those provisions would itself be void and could not be a legal cause of imprisonment. While I find merit in this argument, I need not decide whether the Millses' procedural default should be excused in order to avoid a fundamental miscarriage of justice. This is because even if I consider the merits of the Millses' delegation challenge, I am constrained by Supreme Court precedent to conclude that the Clean Water Act does not impermissibly delegate legislative power to the Corps of Engineers.

## A. *Clean Water Act*

The Clean Water Act was enacted "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Under Sections 301, 404, and 502 of the Clean Water Act [33 U.S.C. §§ 1311, 1344, 1362], it is unlawful to discharge dredged or waste materials into "the navigable waters" without a permit from the Army Corps of Engineers.[3] Most important for present purposes, violations of the Act carry criminal penalties. The negligent discharge of pollutants, without a permit, into the "navigable waters" is punishable by a fine of between $2500 and $25,000 per day of violation, and imprisonment for not more than one year. 33 U.S.C. § 1319(c)(1). The knowing discharge of pollutants, without a permit, into the "navigable waters" is punishable by a fine of between $5,000 and $50,000, and imprisonment for not more than three years. 33 U.S.C. § 1319(c)(2). As defined in the Act, "sand" is included as a "pollutant."

The key to these sections is the term "navigable waters," for that term determines the very scope of the prohibition. Yet, the Act defines "navigable waters" with the utterly non-definitive statement: " 'navigable waters' means the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7).

Therefore, the term "waters of the United States" becomes crucial, for it determines where one can and cannot discharge pollutants—such as sand fill dirt—without a permit. A person who knowingly or willfully discharges such fill dirt, without a permit, into the "waters of the United States" may be imprisoned for up to three years. The term "waters of the United States," however, is defined nowhere in the Act. It is possible that Congress initially assumed that the term

---

**3.** The prohibition is not stated that succinctly in the Clean Water Act, but is derived from reading the three referenced sections in tandem. Section 301 of the Clean Water Act lays down the general rule of prohibited discharges: "Except in compliance with this section and sections 1312, 1316, 1317, 1328, 1342, and 1344 of this title, the discharge of any pollutant by any person shall be unlawful." 33 U.S.C. § 1311.

Section 404 of the Act authorizes the Secretary of the Army, acting through the Chief of Engineers, to "issue permits, ... for the discharge of dredged or fill material into the navigable waters." 33 U.S.C. § 1344(a).

Definitions are found in Section 502 of the Act, 33 U.S.C. § 1362. "Discharge of a pollutant" is defined, as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). "Pollutant" is defined broadly to mean "dredged spoil, solid waste, ... rock, sand, ... discharged into water." 33 U.S.C. § 1362(6). "Navigable waters" is defined as "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7).

Thus, the Act prohibits the "discharge" of "sand" into the navigable waters—defined as the waters of the United States—without a permit issued by the Corps.

would be applied in the traditional manner utilized for such purposes as ascertaining admiralty jurisdiction or the application of the Commerce Clause. But the absence of a definition by Congress left the task of defining "waters of the United States" to the entities charged with administering and enforcing the Act, the Army Corps of Engineers and the Environmental Protection Agency ("EPA").[4]

The Army Corps and the EPA enacted identical regulations defining "waters of the United States", and thereby delineated the jurisdictional limits of the Act.[5] The regulatory definition includes rivers, lakes, streams, territorial seas, all of which are "waters" in the everyday-sense of the word.

The regulation goes much further, however, and defines "waters of the United States" to include something called "wetlands" which are adjacent to traditional "waters"—rivers, lakes, streams, and territorial seas. The regulation then makes a quantum leap onto land. "Wetlands" are defined as "those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs and similar areas." 33 C.F.R. § 328.3(b) (Army Corps definition); 40 C.F.R. § 230.3(t) (EPA definition).

The Millses argue that Congress unconstitutionally delegated its legislative authority to the Army Corps by allowing the Corps to define "waters of the United States" to include "wetlands" in the broad manner it has. According to the Millses, Congress has never defined "waters of the United States" to include wet land, and Congress has never defined "wetlands" in a manner sufficient to meet criminal statute scrutiny. Nor is there an expressed intent of Congress to so delegate that power to the Corps. In short, they point out that there is no statute that makes it a federal crime to place clean, unpolluted

---

**4.** The responsibility for administering and enforcing the Clean Water Act is shared by the Corps and the EPA. The EPA has the authority to seek penalties for discharge of pollutants into waters of the United States without a permit. The EPA can issue an order requiring compliance with the Act, bring a civil action for an injunction and penalties, and seek administrative penalties. 33 U.S.C. § 1319.

The Corps has authority to issue permits to discharge dredged or fill materials into waters of the United States. 33 U.S.C. § 1344(a). In issuing such permits, the Corps is to apply guidelines developed by the EPA, in conjunction with the Corps. 33 U.S.C. § 1344(b). The Corps has the authority to enforce violations of these permits, by issuing orders requiring compliance with the permits, and by bringing civil actions for "appropriate relief, including a permanent or temporary injunction" for violation of a compliance order. 33 U.S.C. § 1344(c).

**5.** Both the Army Corps of Engineers and the EPA define "waters of the United States" as follows:

The term "waters of the United States" means:

(1) All waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;

(2) All interstate waters including interstate wetlands;

(3) All other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce including any such waters:

(i) Which are or could be used by interstate or foreign travelers for recreational or other purposes; or

(ii) From which fish or shellfish are or could be taken and sold in interstate or foreign commerce; or

(iii) Which are used or could be used for industrial purpose by industries in interstate commerce;

(4) All impoundments of waters otherwise defined as waters of the United States under the definition;

(5) Tributaries of waters identified in paragraphs (a)(1) through (4) of this section;

(6) The territorial seas;

(7) Wetlands adjacent to waters (other than waters that are themselves wetlands) identified in paragraphs (a)(1) through (6) of this section.

Waste treatment systems, including treatment ponds or lagoons designed to meet the requirements of CWA (other than cooling ponds as defined in 40 CFR 123.11(m) which also meet the criteria of this definition) are not waters of the United States.

33 C.F.R. § 328.3(a) (1986) (Army Corps' definition); 40 C.F.R. § 230.3(s) (1980) (EPA definition). Only paragraph (7) has any application here.

**1552**

sand on dry appearing land, as the Millses were convicted of and for which they each served 21–months federal prison terms. Thus, their argument goes, it is unconstitutional for the Corps to usurp the legislative task of defining "waters of the United States" to include land that may have wetland vegetation growing on it.

### B. *Delegation*

■ The Constitution provides that "[a]ll legislative Powers herein shall be vested in a Congress of the United States." U.S. Const., Art. I, § 1. From this provision is derived the delegation doctrine: Congress may not constitutionally delegate its legislative power to another branch of government. *Touby v. United States*, 500 U.S. ——, ——, 111 S.Ct. 1752, 1759, 114 L.Ed.2d 219, 227 (1991). This doctrine is "rooted in the principle of separation of powers that underlies our tripartite system of Government." *Mistretta v. United States*, 488 U.S. 361, 371, 109 S.Ct. 647, 654, 102 L.Ed.2d 714, 730 (1989).

Yet, the principle that the Constitution prohibits Congress from delegating its legislative authority is essentially nugatory, for little is required of Congress when it wants to obtain the assistance of its coordinate branches.[6] "So long as Congress 'lay[s] down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform, such legislative action is not a forbidden delegation of legislative power.'" *Touby v. United States, supra*, —— U.S. at ——, 111 S.Ct. at 1759, 114 L.Ed.2d at 227 (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409, 48 S.Ct. 348, 352, 72 L.Ed. 624 (1928)); *Mistret-*

---

**6.** Only twice in history has the Supreme Court declared unconstitutional a Congressional delegation of authority to a governmental body. *Mistretta v. United States*, 488 U.S. 361, 373, 109 S.Ct. 647, 655, 102 L.Ed.2d 714, 731 (1989). In 1935 the Supreme Court, in two separate cases, invalidated provisions of the National Industrial Recovery Act of 1933 (the "NIRA"). First, in *Panama Refining Co. v. Ryan*, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935), the Court invalidated the section of the NIRA which authorized the President to issue executive orders to prohibit the transportation of petroleum products in excess of state quotas (so called "hot oil") in interstate commerce, and established criminal penalties for violations of these executive orders.

After examining the NIRA as a whole, the Court concluded that this delegation of authority was unconstitutional. "As to the transportation of [hot oil], the Congress has declared no policy, has established no standard, has laid down no rule. There is no requirement, no definition of circumstances and conditions in which the transportation is to be allowed or prohibited." 293 U.S. at 430, 55 S.Ct. at 252.

Second, in *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935), the Court invalidated the section of the NIRA which authorized the President to establish "codes of fair competition" for trades or industries. According to the Court, Congress had set forth no principles to guide the President in developing codes of fair competition. Such a delegation was unprecedented:

[This provision] supplies no standards for any trade, industry or activity. It does not undertake to prescribe rules of conduct to be applied to particular states of fact determined by appropriate administrative procedure. Instead of prescribing rules of conduct, it authorizes the making of codes to prescribe them. For

that legislative undertaking, [the section] sets up no standards, aside from the statement of general aims of rehabilitation, correction, and expansion described in section one.... We think that the code-making authority thus conferred is an unconstitutional delegation of legislative power.

295 U.S. at 541–42, 55 S.Ct. at 848.

Since these two cases, however, the Supreme Court has upheld, without deviation, Congress' ability to delegate power to governmental bodies under broad standards. *See, e.g., Nat'l Broadcasting Co. v. United States*, 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943) (upholding delegation to FCC to regulate radio broadcasting "as public convenience, interest or necessity requires"); *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944) (upholding delegation of authority to set "just and reasonable" natural gas rates); *Yakus v. United States*, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944) (upholding delegation to set maximum prices for agricultural commodities which are "generally fair and equitable"); *American Power & Light Co. v. SEC*, 329 U.S. 90, 67 S.Ct. 133, 91 L.Ed. 103 (1946) (upholding delegation of authority to Securities and Exchange Commission to prevent "unfair or inequitable" distribution of voting power among stockholders); *Lichter v. United States*, 334 U.S. 742, 68 S.Ct. 1294, 92 L.Ed. 1694 (1948) (upholding delegation of authority to recover "excessive profits" earned on war contracts).

The Court's treatment of the delegation doctrine since the two 1935 cases led one Justice to conclude that "[the] doctrine is surely as moribund as the substantive due process approach of the same [1930s] era." *Nat'l Cable Television v. United States*, 415 U.S. 336, 353, 94 S.Ct. 1146, 1156, 39 L.Ed.2d 370, 378 (1974) (Marshall, J., concurring in part, dissenting in part).

*ta v. United States, supra,* 488 U.S. at 373, 109 S.Ct. at 655, 102 L.Ed.2d at 730–31.

■ It is the law of this Circuit that delegation challenges are judged according to the following standard:

"Congressional legislation which prescribes essential standards and basic legislative policy and delegates to an administrator authority for promulgation of rules and regulations is constitutionally permissible, provided the standards are sufficiently definite and precise to enable Congress, the courts and the public to ascertain whether the [a]dministrator ... has conformed to those standards."

*United States v. Sans,* 731 F.2d 1521, 1527–28 (11th Cir.1984), *cert. denied,* 469 U.S. 1111, 105 S.Ct. 791, 83 L.Ed.2d 785 (1985) (quoting *United States v. Womack,* 654 F.2d 1034, 1037 (5th Cir. Unit B 1981), *cert. denied,* 454 U.S. 1156, 102 S.Ct. 1029, 71 L.Ed.2d 314 (1982) (citations omitted)). *See also United States v. Gordon,* 580 F.2d 827 (5th Cir.1978), *cert. denied,* 439 U.S. 1079, 99 S.Ct. 860, 59 L.Ed.2d 49 (1979).

■ In judging the constitutionality of a statutory delegation of authority, a court looks not only to the statute itself, but to the legislative history and the context in which the statute was enacted. "The standards of the statute are not to be tested in isolation but must derive meaningful context from the purpose of the statute and its factual background and the statutory context in which the standards appear." *United States v. Sans, supra,* 731 F.2d at 1528; *United States v. Womack, supra,* 654 F.2d at 1037.

■ With these considerations in mind, I turn to the issue of whether the Clean Water Act unconstitutionally delegates to the Army Corps of Engineers the authority to define "navigable waters of the United States" in the manner that the Corps has done. The opinion of the Supreme Court of the United States in *United States v. Riverside Bayview Homes,* 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985), constrains me to conclude that it does not.

Like this case, at issue in *Riverside Bayview Homes* was the authority of the Corps to regulate "wetlands" under the Clean Wa-

ter Act. Specifically, the Court considered the question of whether the Act authorized the Corps to require landowners to obtain a permit from the Corps before discharging fill material into wetlands adjacent to navigable bodies of water. *Id.,* 474 U.S. at 123, 106 S.Ct. at 457, 88 L.Ed.2d at 424. The Court examined the language, policies, and legislative history of the Act, and concluded that the Act did authorize the Corps to regulate wetlands adjacent to navigable bodies of water. "We are thus persuaded that language, policies, and history of the Clean Water Act compel a finding that the Corps has acted reasonably in interpreting the Act to require permits for the discharge of fill material into wetlands adjacent to the 'waters of the United States.'" *Id.,* 474 U.S. at 139, 106 S.Ct. at 465, 88 L.Ed.2d at 434.

A review of these same sources—the language, policies, and legislative history—in light of *Riverside Bayview Homes,* leads me to conclude that the Act did not impermissibly delegate authority to the Army Corps of Engineers by allowing the Corps to define "waters of the United States" as including "wetlands," and to define "wetlands" as encompassing land that is not "wet" in the ordinary sense of the word. First, the legislative history indicates that Congress intended "waters of the United States" to be interpreted to extend as far as was permissible under the Commerce Clause. "The conferees fully intend that the term 'navigable waters' be given the broadest possible constitutional interpretation." *See* H.R.Rep. No. 92–911, 92d Cong., p. 131 (1972), *reprinted in* 1972 U.S.C.C.A.N. 3668, 3776, 3822; 118 Cong.Rec. 33692, 33699 (1972) (statement of Senator Muskie); 118 Cong.Rec. 33756–57 (1972) (statement of Rep. Dingell). This has led numerous courts to conclude that Congress intended the "waters of the United States" to reach the full extent permissible under the Constitution. *United States v. Tilton,* 705 F.2d 429, 431 (11th Cir.1983); *United States v. Lambert,* 695 F.2d 536, 538 (11th Cir.1983); *United States v. Byrd,* 609 F.2d 1204, 1209 (7th Cir.1979); *Leslie Salt Co. v. Froehlke,* 578 F.2d 742, 754–55 (9th Cir.1978); *United States v. Ashland Oil &*

*Transp. Co.*, 504 F.2d 1317, 1324–25 (6th Cir.1974).

Second, the Supreme Court concluded that the interpretation of the term "waters of the United States" to include wetlands adjacent to what are conventionally thought of as "waters" is consistent with the broad purposes of the Clean Water Act. *Riverside Bayview Homes, supra,* 474 U.S. at 132–33, 106 S.Ct. at 462–63, 88 L.Ed.2d at 430. The broad purpose of the Clean Water Act is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251. In *Riverside Bayview Homes,* the Supreme Court stated that this objective "incorporated a broad, systemic view of the goal of maintaining and improving water quality." 474 U.S. at 132, 106 S.Ct. at 462, 88 L.Ed.2d at 430.

> [A]s the House Report on the legislation put it, "the word 'integrity' ... refers to a condition in which the natural structure and function of ecosystems is maintained." Protection of aquatic ecosystems, Congress recognized, demanded broad federal authority to control pollution, for "[w]ater moves in hydrologic cycles and it essential that discharge of pollutants be controlled at the source."

*Id.,* 474 U.S. at 132–33, 106 S.Ct. at 462–63, 88 L.Ed.2d at 430 (citations omitted).

Thus, the broad purpose of the Act was to protect water quality and aquatic ecosystems. It was this broad purpose which guided the Army Corps when it defined "waters of the United States" to include wetlands adjacent to what are commonly thought of as waters—bays, lakes, rivers, etc. The Corps' definition was judged reasonable in *Riverside Bayview Homes, supra.* The Supreme Court concluded that "in defining the waters covered by the Act to include wetlands, the Corps is 'implementing congressional policy rather than embarking on a frolic of its own.'" *Id.,* 474 U.S. at 139, 106 S.Ct. at 465, 88 L.Ed.2d at 434.

The Supreme Court's opinion in *Riverside Bayview Homes* has definitively established that the Corps conformed to Congress' "intelligible principle" when it defined "waters of the United States" to include adjacent wetlands. Of course, to a layman, a "wetland" is land that is often, if not mostly, under standing water or so saturated that it is, in fact, wet. That type of wetland is a logical extension of the adjacent body of water. Despite its blanket approval of the Corps' regulatory authority over "wetlands," it is doubtful that the Supreme Court realized that the Corps' definition extends to land that appears to be dry, but which may have some saturated-soil vegetation, as is the situation here, or that it would define the elements of a felony offense.

The Millses contend that more specificity is required when Congress delegates authority to an entity such as the Army Corps of Engineers to pass regulations that contemplate felony criminal sanctions. This issue was expressly left unresolved by the Supreme Court in its most recent delegation case, *Touby v. United States,* 500 U.S. ——, ——, 111 S.Ct. 1752, 1759, 114 L.Ed.2d 219, 227 (1991). It is certainly true that there is a considerable difference between the power to administratively regulate and the power to set felony crimes.

As a general principle, the criminal laws are to be strictly construed. This rule of lenity "serves to ensure both that there is fair warning of the boundaries of criminal conduct and that legislatures, not courts, define criminal liability." *Crandon v. United States,* 494 U.S. 152, 158, 110 S.Ct. 997, 1001, 108 L.Ed.2d 132, 140 (1990). Statutory language must convey "sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." *United States v. Mena,* 863 F.2d 1522, 1527 (11th Cir.), *cert. denied,* 493 U.S. 834, 110 S.Ct. 109, 107 L.Ed.2d 72 (1989). This is so that persons of common intelligence will not be forced to guess at the potential applicability of a criminal prohibition to their conduct. *Id.* The statutes enacted by Congress define as criminal the discharge of pollutants into the "waters of the United States." I am unable to say that a person of common intelligence would be able to ascertain that this statutory prohibition applies to clean fill dirt placed onto a waterfront lot such as the one at issue here. Yet the Corps' regulatory power to flesh out the statute to cover wetlands has been specif-

ically approved by the Supreme Court, and it leaves little leeway.

Civil penalties are inherent within a regulatory scheme, but there is a serious question about whether the grant of the power to define certain terms for regulatory purposes rises to the power within the Corps of Engineers to define the elements of a felony offense. "The definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes, which are solely creatures of statute." *Liparota v. United States,* 471 U.S. 419, 424, 105 S.Ct. 2084, 2087, 85 L.Ed.2d 434, 439 (1985). Yet a delegation doctrine which essentially allows Congress to abdicate its power to define the elements of a criminal offense, in favor of an un-elected administrative agency such as the Corps of Engineers, does violence to this time-honored principle.

The law of this Circuit appears to be that such delegations of authority are not scrutinized more rigorously. "That the Secretary [of the Treasury] ... could have imposed [reporting requirements] enforceable by criminal penalties did not make the delegation less valid, for 'it is well established that a delegatee may formulate rule for violation of which the statute itself provides penalties imposable by judicial process.'" *United States v. Sans, supra,* 731 F.2d at 1528 (quoting *United States v. Gordon, supra,* 580 F.2d at 840).

### III. CONCLUSION

A jurisprudence which allows Congress to impliedly delegate its criminal lawmaking authority to a regulatory agency such as the Army Corps—so long as Congress provides an "intelligible principle" to guide that agency—is enough to make any judge pause and question what has happened. Deferent and minimal judicial review of Congress' transfer of its criminal lawmaking function to other bodies, in other branches, calls into question the vitality of the tripartite system established by our Constitution. It also calls into question the nexus that must exist between the law so applied and simple logic and common sense. Yet that seems to be the state of the law. Since this court must apply the law

as it exists, and cannot change it, there is nothing further that can be done at this level.

For the reasons discussed herein and in the magistrate judge's report and recommendation, the motion to vacate, set aside, or correct sentence, and/or for a writ of error coram nobis, must be, and is, DENIED.

DONE AND ORDERED.

### REPORT AND RECOMMENDATION

NOVOTNY, United States Magistrate Judge.

Before the court is a motion to vacate sentence and/or petition for writ of error coram nobis submitted by both defendants (doc. 152). The United States has responded in opposition to the motion (doc. 156) and the movants have replied thereto (doc. 159).

The court will recall that on April 13, 1989 the movants were sentenced to twenty-one months incarceration and one year supervised release following jury verdicts of guilty upon all six counts of an indictment charging violations of the Clean Water Act. Following their convictions, movants filed a direct appeal and their convictions were summarily affirmed by the Eleventh Circuit Court of Appeals. Movants have now fully served the terms of incarceration and supervision.

In seeking post-conviction collateral relief, movants argue that, due to fundamental errors during the trial and exceptional circumstances, their sentences should be vacated and they should be discharged from the judgments against them. Specifically, movants contend (1) that their criminal prosecution under the Clean Air Act involving alleged violations pertaining to "wetlands" was unconstitutional because the Act is violative of the constitutional doctrine of separation of powers; (2) that movants are victims of selective prosecution; (3) that movants were denied due process when the trial court disallowed a defense based upon principles of equitable estoppel; and (4) that the trial evidence was insufficient to establish that, at the time of the movants' placement of fill material, the property was "wetlands". The government, in opposition, contends that the first two issues should not be considered by the court since they were not presented ear-

lier and no showing of cause and prejudice has been made and the second two issues should not be considered since they were previously litigated and resolved in movants' disfavor on direct appeal.

## I. *Separation of Powers*

The government argues that movants' claim that their convictions are based upon a statute which violates the doctrine of separation of powers is not reviewable in collateral proceedings since movants failed to raise this constitutional challenge during the proceedings before the trial court and on direct appeal. The government further argues that this procedural default cannot be overcome in the absence of movants' establishing cause for not raising the issue earlier and showing actual prejudice resulting from the error. *United States v. Frady,* 456 U.S. 152, 165, 102 S.Ct. 1584, 1593, 71 L.Ed.2d 816 (1982); *United States v. Jordan,* 915 F.2d 622 (11th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1629, 113 L.Ed.2d 725 (1991); *Greene v. United States,* 880 F.2d 1299, 1305 (11th Cir.1989), *cert. denied,* 494 U.S. 1018, 110 S.Ct. 1322, 108 L.Ed.2d 498 (1990). Movants respond to the government's objection by claiming this constitutional infirmity is a cognizable issue under Section 2255 since it alleges a "fundamental defect which inherently results in a complete miscarriage of justice" and "presents exceptional circumstances where the need for the remedy afforded by the writ of habeas corpus is apparent". *Hill v. United States,* 368 U.S. 424, 428, 82 S.Ct. 468, 471, 7 L.Ed.2d 417 (1962).

Initially, the record reflects that on direct appeal movants challenged the constitutionality of Title 33, United States Code, Section 1311 on the basis of vagueness and overbreadth in that it "encompasses legal conduct which subjects its enforcement to arbitrary and discriminatory enforcement". Doc. 113, attached Appellant's Brief, p. 42–3. In the instant motion to vacate, movants challenge Congress' apparent improper delegation within this statute to the executive branch of the legislative responsibility to define and then regulate wetlands as well as to have criminal enforcement responsibilities over violations to the wetlands. Clearly the issue now raised could have and should have been presented with the closely related constitutional challenge argued on direct appeal. As the Supreme Court stressed in *United States v. Frady, supra,* "a collateral challenge may not do service as an appeal". Moreover, "a district court cannot reach the merits of an appealable issue in a Section 2255 proceeding unless that issue has been raised in a procedurally appropriate manner.... [A] failure to raise constitutional challenges to a conviction on direct appeal bars a petitioner from raising the same issue in a Section 2255 proceeding—absent a showing of good cause for and prejudice from the failure to appeal". *Theodorou v. United States,* 887 F.2d 1336, 1339 (7th Cir.1989). *See also, Cross v. United States,* 893 F.2d 1287, 1289 (11th Cir. 1990), *cert. denied,* 498 U.S. 849, 111 S.Ct. 138, 112 L.Ed.2d 105 (1990).

Movants make no attempt to show cause for their default and rely only upon their argument that this constitutional challenge, although not properly brought earlier, nevertheless demonstrates a fundamental defect which has resulted in a miscarriage of justice. In establishing such an "exceptional circumstance", movants are presumably obliged to show more than "plain error" and more than the "actual prejudice" (defined as a violation of due process of constitutional dimension which worked to movants' actual and substantial disadvantage) required in conjunction with a showing of cause to overcome a procedural default. *Cross,* 893 F.2d at 1289, 1292. Because in the immediate prosecution the determination of whether the area in question constituted wetlands was seemingly made by the jury and not by the Army Corps of Engineers, and the Corps merely regulated that the term "waters of the United States" includes "adjacent wetlands", the undersigned finds that movants have failed to establish that their convictions represent a fundamental miscarriage of justice. Due to their procedural default upon this claim, collateral relief is inappropriate.

## II. *Selective Prosecution*

■ Movants argue that they were the victims of selective prosecution due to their public speech in opposition to the Army

Corps of Engineers regulatory programs. Movants provide a letter (which they obtained through the Freedom of Information Act after their conviction) from the Corps of Engineers to the United States Attorney as the basis for this claim and for their request for an evidentiary hearing.

This issue has not been raised previously by movants because, they assert, it was not until recently that they learned of this correspondence between the United States Attorney and their client agency. While this may be a sufficient showing to establish cause, *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986), movants have nonetheless failed to establish actual prejudice to overcome their default. By not making a substantial showing that they would succeed upon their selective prosecution claim, movants have failed to demonstrate actual prejudice.

To establish a bona fide selective prosecution claim, movants "must establish first, that they have been singled out for prosecution while others similarly situated have not ... and second, that the decision to prosecute was invidious or in bad faith because it was based upon an impermissible factor such as race" or in retaliation for their exercise of constitutional rights. *Rickett v. Jones*, 901 F.2d 1058, 1066 n. 6 (11th Cir.1990) quoting *United States v. Gordon*, 817 F.2d 1538, 1539 (11th Cir.1987) *vacated in part on other grounds*, 836 F.2d 1312 (11th Cir.1988), *cert. dismissed*, 487 U.S. 1265, 109 S.Ct. 28, 101 L.Ed.2d 979 (1988); *United States v. Lamberti*, 847 F.2d 1531, 1535 (11th Cir.), *cert. denied*, 488 U.S. 970, 109 S.Ct. 501, 102 L.Ed.2d 537 (1988). Movants' burden of proof in making a prima facie showing of selective prosecution has been characterized as "heavy". *Fillingham v. Boone*, 835 F.2d 1389, 1399 (11th Cir.1988). Moreover, movants are obligated to present facts "sufficient to create a reasonable doubt about the constitutionality of a prosecution" before an evidentiary hearing is required. *United States v. Silien*, 825 F.2d 320, 322 (11th Cir.1987); *Owen v. Wainwright*, 806 F.2d 1519, 1523 (11th Cir.), *cert. denied*, 481 U.S. 1071, 107 S.Ct. 2466, 95 L.Ed.2d 875 (1987).

As mentioned above, movants support their claim of selective prosecution with a statement made in a letter dated February 12, 1987 written by the District Engineer for the Corps of Engineers to the United States Attorney which recommended criminal prosecution of Ocie Mills. (The letter does not mention Carey Mills.) This letter states:

> Due to Mr. Mills' highly publicized prior involvement with the Corps Regulatory Program for work in East Bay beginning in 1976, his documented furnishing of advice to others with intent to subvert the Corps Regulatory Program, and the communications between the Corps and Mr. Jenkins explaining the site specific problems prior to the April 18, 1986 transfer of title to Mr. Mills, it is recommended that Mr. Mills be prosecuted criminally. Lewis W. Jenkins and Ocie Mills should be held civilly responsible for restoring their own portions of the violation site.

(doc. 156, attachment).

Although the above language may be viewed as evidence that the agency's referral of their case involving Ocie Mills for criminal prosecution may have been in part the result of vindictiveness on the part of the agency's officials against Mr. Mills, movants have proffered no evidence that this possible motive of the referring agency impugned the decision of the prosecutors to present the charges to the grand jury or to proceed with the case to trial. *See, United States v. Bassford*, 812 F.2d 16, 21 n. 25 (1st Cir.1987), *cert. denied*, 481 U.S. 1022, 107 S.Ct. 1909, 95 L.Ed.2d 514 (1987) (motives of arresting officers are not presumed to be the motives of the prosecutor); *United States v. Bourgue*, 541 F.2d 290, 293 (1st Cir.1976). *See also, United States v. Lamberti, supra*. In addition, movants have made no showing that prosecutions are not normally instituted for the offenses for which they were convicted, nor have they demonstrated that other persons similarly situated have not been criminally prosecuted. Although movants point to an individual named S. Victor who filled wetlands without a permit "but was able to resolve his case by submitting an after-the-fact permit application", movants have not shown that they were in that same posture when the indictment was sought or at the time of trial.

Because movants have failed to make a substantial showing of either prong of the selective prosecution claim they raise, they have as well failed to establish actual prejudice so as to excuse their procedural default. Collateral review should be denied on this claim.

III. *Defense of Equitable Estoppel, and*

IV. *Jurisdictional Question: Sufficiency of the evidence as to a "wetland"*

It is seemingly uncontested that each of these issues were fully briefed to the Eleventh Circuit on direct appeal. Since the movants have failed to establish an intervening change in the law since their convictions were affirmed on appeal, these issues are not cognizable under Section 2255. *Davis v. United States,* 417 U.S. 333, 342, 94 S.Ct. 2298, 2303, 41 L.Ed.2d 109 (1974); *United States v. Rowan,* 663 F.2d 1034, 1035 (11th Cir.1981) citing with approval *Buckelew v. United States,* 575 F.2d 515 (5th Cir.1978).

In light of the above discussion relative to the four claims raised in the Section 2255 motion to vacate sentence, the undersigned RECOMMENDS the relief sought be denied without further proceedings.

At Pensacola, Florida, this <u>26th</u> day of June, 1992.